**HWANG GEUM JOO, et al., Plaintiffs,**

v.

**JAPAN, Defendant.**

**No. Civ.A. 00–02233(HHK).**

United States District Court,
District of Columbia.

Oct. 4, 2001.

Michael David Hausfeld, Elizabeth Haines Cronise, Cohen, Millstein, Hausfeld & Toll, P.L.C., Washington, DC, Johnnie L. Cochran, Jr., New York City, for plaintiffs.

Craig Alan Hoover, Jonatha Lynwood Abram, Hogan & Hartson, L.L.Pl., Washington, DC, for Japan, defendant.

Amy Marie Allen, Hogan & Hartson, L.L.P., Washington, DC, for U.S., nonparty.

## MEMORANDUM OPINION

KENNEDY, District Judge.

This case is brought by fifteen foreign women, on behalf of themselves and others similarly situated, who allege that they were victims of sexual slavery and torture at the hands of the Japanese military before and during World War II. The fifteen named plaintiffs allege that this conduct occurred throughout Japanese-occupied Asia, including specifically in Japan, Ko-

rea, China, the Philippines, Taiwan, Burma, Singapore, and the Dutch East Indies. Defendant Japan has moved to dismiss the complaint under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).[1] Upon consideration of Japan's motion to dismiss, plaintiffs' opposition thereto, and the record of this case, the court concludes that Japan's motion must be granted.

## I. BACKGROUND

In the years leading up to and during World War II the world witnessed some of the worst atrocities ever committed by mankind. Fascist regimes spread virtually unchecked throughout the globe perpetrating such evil that the phrase "crimes against humanity" is hardly an adequate description. The international community has spent much of the last half century attempting to come to terms with these events. Indeed, in the last decade alone many steps were taken to obtain compensation for the victims. Much of this attention, however, has focused exclusively on the conduct of the Nazi regime in Europe.

Although forgotten by many in the Western Hemisphere, Asia was certainly not immune from the perils of fascism during this era. This case focuses attention on the egregious conduct of Japan during its conquest of Asia—conduct that included sexual slavery and mass rape on an institutional scale. Plaintiffs allege that along with approximately 200,000 other women they were forced into sexual slavery by the Japanese Army between 1931 and 1945. These women, referred to as "comfort women," were recruited through forcible abductions, deception, and coercion. Once captured by the Japanese military they were taken to "comfort stations." "Comfort stations" were facilities seized or built by the military near the front lines specifically to house "comfort women." While at these facilities the women were repeatedly raped—often by as many as thirty or forty men a day—tortured, beaten, mutilated, and sometimes murdered. The women were denied proper medical attention, shelter, and nutrition. Many of the women endured this brutal treatment for years. Plaintiffs estimate that only 25% to 35% of the "comfort women" survived the war, and those who did suffered health effects, including damage to reproductive organs and sexually transmitted diseases.

Plaintiffs assert that this conduct "was a systematic and carefully planned system ordered and executed by the Japanese government." Compl. ¶ 50. The "comfort stations" were for use by the Japanese military, and were regulated by the Japanese Army. Soldiers were charged a fee for access. The price charged depended on the woman's nationality, and at least a portion of the revenue went to the military. A soldier's length of stay and time of visit were determined based upon his rank. The "comfort women" were treated as mere military supplies, and were even catalogued on supply lists under the heading of "ammunition."

The scope of this "premeditated master plan" to enslave and rape thousands of

---

**1.** Japan's motion to dismiss the complaint asserts several grounds for dismissal: 1) that Japan enjoys sovereign immunity; 2) that the court lacks personal jurisdiction over Japan; 3) that this action presents a political question; 4) that even if jurisdiction exists this case should be dismissed on the grounds of forum nonconveniens; 5) that the international comity of nations requires dismissal; 6) that the statute of limitations has expired; and 7) that under the Alien Tort Claims Act these claims should be dismissed. Because Japan enjoys sovereign immunity and this action, in any event, presents a non-justiciable dispute, dismissal is required under Federal Rules of Civil Procedure 12(b)(1). Therefore, the court does not reach Japan's other grounds for dismissal.

women was immense, and no doubt "required the deployment of the vast infrastructure and resources that were at the government's disposal, including soldiers and support personnel, weapons, all forms of land and sea transportation, and engineering and construction crews and material." Compl. ¶¶ 1, 56. In the decades after the war, however, Japan largely ignored and denied allegations concerning the "comfort women" system. Not until 1992 did the Japanese government officially acknowledge some involvement in the operation of "comfort stations." Since that time several officials have expressed their apologies for Japan's involvement, but the Japanese government has not taken full responsibility for its actions, and has not paid reparations to the "comfort women." Plaintiffs therefore filed this lawsuit seeking compensation for the inhumane treatment they experienced.

## II. ANALYSIS

■■■ Because this suit is brought against Japan, jurisdiction is premised exclusively on the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1602 *et seq.* *See Argentine Republic v. Amerada Hess Shipping Corp.,* 488 U.S. 428, 434, 109 S.Ct. 683, 102 L.Ed.2d 818 (1989) ("We think that the text and structure of the FSIA demonstrate Congress' intention that the FSIA be the sole basis for obtaining jurisdiction over a foreign state in our courts."). In the FSIA Congress mandated presumptive immunity for foreign nations from lawsuits brought in the United States. However, the FSIA also provides several exceptions to this general grant of immunity. *See* 28 U.S.C. §§ 1605–1607. After the defendant has produced prima facie evidence supporting its entitlement to immunity, "the burden of going forward . . . shift[s] to the plaintiff to produce evidence establishing that the foreign state is not entitled to immunity." H.R.Rep No. 94–1487, at 17, U.S.Code Cong. & Admin.News 1976, p. 6604 (1976). The defendant then has the ultimate burden of proving immunity. *See, e.g., Transamerican S.S. Corp. v. Somali Democratic Republic,* 767 F.2d 998, 1002 (D.C.Cir.1985). When "the defendant challenges only the legal sufficiency of the plaintiff's jurisdictional allegations, then the district court should take the plaintiff's factual allegations as true and determine whether they bring the case within any of the exceptions to immunity invoked by the plaintiff." *Phoenix Consulting, Inc. v. Republic of Angola,* 216 F.3d 36, 40 (D.C.Cir.2000).

The defendant in this case, Japan, is presumptively immune from suit under the FSIA because it is a foreign state. In their papers plaintiffs argue that two exceptions to the FSIA apply.[2] The complaint specifically alleges that Japan "waived its immunity as to the claims of the 'Comfort Women' as described in 28

---

**2.** At oral argument on the motion to dismiss, held two months after briefing concluded, plaintiffs for the first time sought to invoke an additional exception—the noncommercial tort exception contained in 28 U.S.C. § 1605(a)(5). The court will not consider the application of this exception. It was neither mentioned in the complaint nor raised in any of the papers filed in opposition to Japan's motion to dismiss. Moreover, it was not raised in plaintiffs' Motion for Declaratory Judgment seeking a declaration that Japan could not claim sovereign immunity in its defense of this suit. Like the complaint, this filing asserted that Japan waived its immunity under § 1605(a)(1), and the third clause of § 1605(a)(2). Therefore, because the noncommercial tort exception was raised for the first time at oral argument, it will not be considered. *Cf. Corson & Gruman Co. v. NLRB,* 899 F.2d 47, 50 n. 4 (D.C.Cir.1990) ("We require petitioners and appellants to raise all of their arguments in the opening brief to prevent 'sandbagging' of appellees and respondents and to provide opposing counsel the chance to respond.")

U.S.C. § 1605(a)(1)" and that "the planning, establishment and operation of a network of 'comfort houses' is a commercial activity that is not subject to sovereign immunity pursuant to 28 U.S.C. § 1605(a)(2)." Compl. § 5. Before addressing these two exceptions, it is appropriate to discuss briefly the threshold issue of whether the FSIA applies to events—such as the ones that are the subject of plaintiffs' complaint—which occurred before 1952.

## A. Retroactive Application of the FSIA

Until 1952 foreign sovereigns were granted immunity at the discretion of the executive branch. The State Department generally granted immunity to friendly foreign sovereigns in all actions brought in United States courts. *See Verlinden B.V. v. Central Bank of Nigeria*, 461 U.S. 480, 486, 103 S.Ct. 1962, 76 L.Ed.2d 81 (1983). In 1952, Jack B. Tate, then-Acting Legal Adviser, Department of State, wrote what is now known as the "Tate Letter" to Acting Attorney General Philip B. Perlman, stating that the State Department would adopt a restrictive theory of foreign sovereign immunity. *Id.* at 487 n. 9, 103 S.Ct. 1962. From that point forward immunity was granted only in suits involving a foreign sovereign's public acts.

In an effort to reduce the political and diplomatic pressure foreign governments often placed on the State Department to grant immunity, Congress sought to codify the standards and conditions for determining when sovereign immunity would be denied. In 1976, Congress enacted the FSIA "to free the Government from the case-by-case diplomatic pressures, to clarify the governing standards, and to 'assur[e] litigants that ... decisions are made on purely legal grounds and under procedures that insure due process.'" *Id.* at 488, 103 S.Ct. 1962, (quoting H.R.Rep. No. 94–1487, at 7 (1976) reprinted in 1976 U.S.C.C.A.N. 6604). Because the FSIA codified standards in place as of 1952, it is generally accepted that the FSIA applies to all events occurring from 1952 to the present. The controversy lies in whether the FSIA can be applied to events that occurred before 1952.

The D.C. Circuit has never expressly addressed the issue of whether the FSIA applies to pre–1952 events. Although, in *Princz v. Federal Republic of Germany*, 26 F.3d 1166, 1170–71 (D.C.Cir.1994), the court did comment on the issue. Without deciding the question the court provided some significant observations. Focusing on *Landgraf v. USI Film Products*, 511 U.S. 244, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994),[3] it reasoned that the FSIA might be applied retroactively to pre–1952 events because doing so would not affect the foreign sovereign's substantive rights. The court stated in dicta that applying the FSIA to Germany's acts during World War II "would not alter Germany's liability under the applicable substantive law in force at the time, i.e. it would just remove the bar of sovereign immunity to the plaintiff's vindicating his rights under that law."

---

**3.** In *Landgraf*, a case dealing generally with retroactive application of statutes, the Supreme Court held that,

> only a statute that would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed is truly retroactive. A statute affecting jurisdiction, on the other

hand, usually take[s] away no substantive right but simply changes the tribunal that is to hear the case. Present law normally governs in such situations because jurisdictional statutes speak to the power of the court rather than to the rights or obligations of the parties.

*Princz*, 26 F.3d at 1170 (internal quotations and citations omitted).

*Princz,* 26 F.3d at 1171. This analysis tends to reflect the line of cases that have confronted the issue since the 1994 decision in *Landgraf. See Altmann v. Republic of Austria,* 142 F.Supp.2d 1187, 1198–1201 (C.D.Cal.2001) (holding that the FSIA applied to pre–1952 events); *Haven v. Rzeczpospolita Polska (Republic of Poland),* 68 F.Supp.2d 943 (N.D.Ill.1999) (adopting the reasoning in *Princz* and concluding that the FSIA applied to pre–1952 events).

Although the only two circuits that expressly addressed this issue held that the FSIA did not apply to pre–1952 events, *see Carl Marks & Co., Inc. v. Union of Soviet Socialist Republics,* 841 F.2d 26, 27 (2d Cir.1988); *Jackson v. People's Republic of China,* 794 F.2d 1490, 1497–98 (11th Cir. 1986), both of these cases were decided prior to *Landgraf* and *Princz.* Additionally, at least two district court judges in this circuit have also decided the issue, and both found that the FSIA did not apply to pre–1952 events. *See Lin v. Government of Japan,* C.A. No. 92–2574, 1994 WL 193948, at *2 (D.D.C. May 6, 1994) (Hens–Green, J.); *Djordjevich v. Federal Republic of Germany,* 827 F.Supp. 814 (D.D.C. 1993) (Hens–Green, J.), *aff'd on other grounds,* 1997 WL 530499, 124 F.3d 1309 (D.C.Cir.1997); *Slade v. United States of Mexico,* 617 F.Supp. 351, 355 (D.D.C.1985) (Greene, J.), *aff'd without opinion,* 790 F.2d 163 (D.C.Cir.1986). Again, however, these cases were decided prior to *Princz.*

As was the case in *Princz,* this court need not "decide whether the FSIA applies to pre–1952 events, however, in order to resolve this case." *Princz,* 26 F.3d at 1171; *see also Sampson v. Federal Republic of Germany,* 250 F.3d 1145, 1149 n. 3 (7th Cir.2001) ("We need not decide whether the pre–1952 law or the less stringent theory of sovereign immunity codified in the FSIA applies because, ... Sampson's

suit against Germany is barred even under the lower standards of the FSIA."). Assuming that the FSIA does govern plaintiffs' claims, none of its exceptions apply. On the other hand the if FSIA does not apply, and if Japan is not entitled to sovereign immunity under pre–1952 law, plaintiffs' claims must still be dismissed because they are nonjusticiable.

## B. Exceptions to the FSIA

Based upon the waiver and commercial activity exceptions plaintiffs advance three arguments in support of Japan's amenability to suit. First, plaintiffs claim that Japan explicitly waived immunity in the Potsdam Declaration signed after World War II. Second, plaintiffs argue that the acts in question constitute a violation of the *jus cogens* norms of the law of nations, and as such immunity was implicitly waived. And third, plaintiffs assert that the acts were in connection with commercial activities outside the United States that had a direct effect inside the United States. Because at this stage of the litigation Japan only challenges the legal sufficiency of plaintiffs' allegations, the court will assume the allegations in the complaint are true in order to determine if these FSIA exceptions apply. *See Phoenix Consulting,* 216 F.3d at 40.

Section 1605(a) of the FSIA provides, *inter alia,* that

A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case—

(1) in which the foreign state has waived its immunity either explicitly or by implication, notwithstanding any withdrawal of the waiver which the foreign state may purport to effect except in accordance with the terms of the waiver;

(2) in which the action is based upon a commercial activity carried on in the

United States by the foreign state; or upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States;

28 U.S.C. § 1605(a).

### 1. Explicit Waiver Under the Potsdam Declaration

■ Relying on § 1605(a)(1), plaintiffs first argue that Japan explicitly waived its sovereign immunity by agreeing to the terms of the Potsdam Declaration. However, because case law states that such a waiver needs to be clear, intentional, and unambiguous, plaintiffs' argument must be rejected. The Potsdam Declaration does not explicitly state that Japan waived its immunity or intended to subject itself to civil suits in United States courts, and therefore does not constitute an explicit waiver of immunity under § 1605(a)(1).

Plaintiffs rely on a paragraph of the Potsdam Declaration that states:

We do not intend that the Japanese shall be enslaved as a race or destroyed as a nation, but stern justice shall be meted out to all war criminals, including those who have visited cruelties upon our prisoners. The Japanese Government shall remove all obstacles to the revival and strengthening of democratic tendencies among the Japanese people.

Potsdam Declaration, July 26, 1945. Plaintiffs also seek support from a post-World War II case in which the Supreme Court noted that "Japan, by her acceptance of the Potsdam Declaration and her surrender, has acquiesced in the trials of those guilty of violations of the law of war." *In re Yamashita,* 327 U.S. 1, 13, 66 S.Ct. 340, 90 L.Ed. 499 (1946). While the statement of the Supreme Court is entirely consistent with the language of the Potsdam Declaration, neither of these sources support plaintiffs' position that Japan explicitly waived its immunity.

■ In *Argentine Republic v. Amerada Hess Shipping Corp.,* 488 U.S. 428, 109 S.Ct. 683, 102 L.Ed.2d 818 (1989), the Supreme Court stated that it did not "see how a foreign state can waive its immunity under § 1605(a)(1) by signing an international agreement that contains no mention of a waiver of immunity to suit in United States courts or even the availability of a cause of action in the United States." *Id.* at 442–43, 109 S.Ct. 683. An "[e]xplicit waiver is generally found when the [ ] language itself clearly and unambiguously states that the parties intended waiver, and therefore adjudication, in the United States." *Commercial Corp. Sovrybflot v. Corporacion de Fomento de la Produccion,* 980 F.Supp. 710, 712 (S.D.N.Y.1997) (quoting *Eaglet Corp. Ltd. v. Banco Central De Nicaragua,* 839 F.Supp. 232, 234 (S.D.N.Y.1993)); *see, e.g., Foremost–McKesson, Inc. v. Islamic Republic of Iran,* 905 F.2d 438 (D.C.Cir.1990) (holding that Iran did not waive its sovereign immunity in the Treaty of Amity, which extended only to enterprises of Iran doing business in the U.S. and not to Iran itself); *Maritime Int'l Nominees Establishment v. Republic of Guinea,* 693 F.2d 1094, 1100 n. 10 (D.C.Cir.1982) (stating that "Congress contemplated waivers of a much more specific and explicit nature than the one MINE constructs from the operation of this Guinean law").

In addition, as Japan argues, the Potsdam provision holds individuals accountable for war crimes, but cannot extend to holding the government of Japan liable in a civil suit. Similarly, in *Von Dardel v. Union of Soviet Socialist Republics,* 736 F.Supp. 1 (D.D.C.1990), a district court

found that the Vienna Convention "requires jurisdiction over *crimes*, not civil suits, and in any event not necessarily over foreign states. The 1973 Convention contains no terms at all which conflict with sovereign immunity." *Id.* at 5.

Therefore, because the law requires that an explicit waiver must be unambiguous and intentional, the court concludes that Japan's agreement with the terms of the Potsdam Declaration does not constitute an explicit waiver under § 1605(a)(1).

### 2. Jus Cogens *Violations*

■■■ Plaintiffs next contend that Japan's *jus cogens* violations constitute an implied waiver of sovereign immunity under § 1605(a)(1).[4] However, this argument is contrary to the law of this circuit. In *Princz* the D.C. Circuit squarely held that the *"jus cogens* theory of implied waiver is incompatible with the intentionality requirement implicit in § 1605(a)(1).... [A]n implied waiver depends upon the foreign government's having at some point indicated its amenability to suit." *Princz*, 26 F.3d at 1174. Acknowledging that "it is doubtful that any state has ever violated *jus cogens* norms on a scale rivaling that of the Third Reich," the D.C. Circuit nonetheless concluded that *jus cogens* violations did not constitute an implied waiver under § 1605(a)(1). *Id.* This conclusion is the same one reached by the three other circuit courts that have ruled on the issue.

*See Sampson v. Federal Republic of Germany*, 250 F.3d 1145, 1156 (7th Cir.2001) (concluding that "Congress did not create an exception to foreign sovereign immunity under the FSIA for violations *of jus cogens* norms"); *Cabiri v. Government of the Republic of Ghana*, 165 F.3d 193, 202 (2d Cir.1999) (holding that a waiver could not be implied from a sovereign's *jus cogens* violation); *Smith v. Socialist People's Libyan Arab Jamahiriya*, 101 F.3d 239 (2d Cir.1996) (same); *Siderman de Blake v. Republic of Argentina*, 965 F.2d 699, 719 (9th Cir.1992) ("[W]e conclude that if violations of *jus cogens* committed outside the United States are to be exceptions to immunity, Congress must make them so. The fact that there has been a violation of *jus cogens* does not confer jurisdiction under the FSIA.")

Quite telling of the weakness of their argument is the fact that plaintiffs have failed to cite any United States court decision, nor is the court aware of any, holding that *jus cogens* violations constitute a waiver under the FSIA. Indeed, plaintiffs acknowledge the D.C. Circuit's holding in *Princz*, but ask the court to disregard it. Instead, plaintiffs argue that this court should adopt the reasoning in Judge Wald's dissent in *Princz*, suggesting that the majority's opinion is no longer good law.

This argument must fail. The majority's opinion in *Princz* unquestionably re-

---

**4.** "A *jus cogens* norm is a principle of international law that is 'accepted by the international community of States as a whole as a norm from which no derogation is permitted....' Such peremptory norms are 'nonderogable and enjoy the highest status within international law,' they 'prevail over and invalidate international agreements and other rules of international law in conflict with them,' and they are 'subject to modification only by a subsequent norm of international law having the same character.' "

According to one authority, a state violates *jus cogens*, as currently defined, if it: 'practices, encourages, or condones (a) genocide, (b) slavery or slave trade, (c) the murder or causing the disappearance of individuals, (d) torture or other cruel, inhuman, or degrading treatment or punishment, (e) prolonged arbitrary detention, (f) systematic racial discrimination, or (g) a consistent pattern of gross violations of internationally recognized human rights.' *Princz*, 26 F.3d at 1173 (internal citations omitted).

mains good law. Indeed, in *Creighton Ltd. v. Government of the State of Qatar*, 181 F.3d 118 (D.C.Cir.1999), the D.C. Circuit recently reaffirmed the underlying rationale of *Princz*. The court stated that "we have ... followed the 'virtually unanimous' precedents construing the implied waiver provision narrowly. In particular, we have held that implicit in § 1605(a)(1) is the requirement that the foreign state have intended to waive its sovereign immunity." *Creighton*, 181 F.3d at 122 (citing *Princz*, 26 F.3d at 1174) (internal citation omitted).

In light of the binding precedent of the D.C. Circuit in *Princz*, the court concludes that Japan's *jus cogens* violations do not constitute an implied waiver under § 1605(a)(1).

### 3. Commercial Activity Exception

Lastly, plaintiffs maintain that this case falls within the FSIA exception provided in the third clause of § 1605(a)(2). Plaintiffs argue that the present action is based "upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act cause[d] a direct effect in the United States." 28 U.S.C. § 1605(a)(2); *see* Pls.' Mot.Decl.J. at 31.

Plaintiffs' argument is based on the allegation that the "comfort stations" were merely "state-supervised brothels," and therefore constitute commercial activities that occurred outside the United States. In an effort to satisfy the second prong, plaintiffs advance three theories explaining how these "commercial activities" had a "direct effect" inside the United States. They first argue that "comfort stations" were established inside Guam and the Philippines. Because these were United States territories at the time, plaintiffs

maintain there was a direct effect in the United States. Second, plaintiffs assert that after World War II the Japanese territories occupied by the United States military became part of the United States. Therefore, the burden of repatriating, debriefing, housing, clothing, and treating "comfort women" in these areas was a direct effect in the United States. Third, plaintiffs claim that the alleged use of "comfort women" by United States servicemen after the war constituted a direct effect in the United States. *See* Pls' Mot. Decl.J. at 34–38.

In order to evaluate the applicability of § 1605(a)(2), the court must first determine if the alleged conduct can be considered a commercial activity within the meaning of the FSIA. Plaintiffs argue that the "comfort women" system constituted a commercial activity under § 1605(a)(2). Pls.' Mot.Decl.J. at 31. Both Japan and the United States[5] disagree, maintaining that Japan's conduct does not fall within the commercial activity exception. The FSIA defines "commercial activity" to mean "either a regular course of commercial conduct or a particular commercial transaction or act. The commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose." 28 U.S.C. § 1603(d). The Supreme Court has elaborated on this definition, stating that

> when a foreign government acts, not as regulator of a market, but in the manner of a private player within it, the foreign sovereign's actions are "commercial" within the meaning of the FSIA. Moreover ... the question is not whether the

---

**5.** Pursuant to 28 U.S.C. § 517, the United States filed a statement of interest in this case. In this document the United States agrees with Japan's position that plaintiffs' claims are barred by sovereign immunity and present a nonjusticiable political question.

foreign government is acting with a profit motive or instead with the aim of fulfilling uniquely sovereign objectives. Rather, the issue is whether the particular actions that the foreign state performs (whatever the motive behind them) are the type of actions by which a private party engages in "trade and traffic or commerce," Black's Law Dictionary 270 (6th ed.1990).

*Republic of Argentina v. Weltover, Inc.,* 504 U.S. 607, 614, 112 S.Ct. 2160, 119 L.Ed.2d 394 (1992).

After *Weltover,* the Supreme Court next examined the commercial activity exception in *Saudi Arabia v. Nelson,* 507 U.S. 349, 113 S.Ct. 1471, 123 L.Ed.2d 47 (1993). The plaintiff in *Nelson* was recruited in the United States for a job at a Saudi-government-owned hospital in Saudi Arabia. *See id.* at 352. He subsequently accepted a position in which he monitored certain hospital equipment and facilities to ensure patient safety. *See id.* While performing this task he discovered "safety defects" at the hospital, and reported the problems to Saudi government officials. *See id. at* 353, 113 S.Ct. 1471. The Saudi government responded by imprisoning Nelson. While in prison he was allegedly tortured and interrogated repeatedly. *See id.* After his release Nelson and his wife filed a lawsuit against Saudi Arabia. They sought to overcome Saudi Arabia's sovereign immunity by arguing under the first clause of § 1605(a)(2) that their claims were "based upon a commercial activity carried on in the United States." The commercial activity upon which they relied was the recruitment of Nelson in the United States. *See id.* at 354–55.

The Supreme Court rejected this argument. Writing for the Court Justice Souter reasoned that the conduct the Nelsons challenged, wrongful arrest, imprisonment, and torture,

boil[ed] down to abuse of the power of its police by the Saudi Government, and however monstrous such abuse undoubtedly may be, a foreign state's exercise of the power of its police has long been understood for purposes of the restrictive theory as peculiarly sovereign in nature. Exercise of the powers of police and penal officers is not the sort of action by which private parties can engage in commerce.

*Id.* at 361–62, 113 S.Ct. 1471 (internal citations and footnote omitted). The court next rejected the argument that because Nelson was imprisoned and tortured in retaliation for reporting safety violations at a hospital, "the mistreatment was consequently commercial." *Id.* This argument failed because it went to the purpose of the Saudi Government's conduct, the very inquiry that the FSIA "renders irrelevant." *Id.* at 363, 113 S.Ct. 1471. Addressing this issue the court stated that "[w]hatever may have been the Saudi Government's motivation for its allegedly abusive treatment of Nelson, it remains the case that the Nelsons' action is based upon a sovereign activity immune from the subject-matter jurisdiction of the United States courts under the Act." *Id.* at 363, 113 S.Ct. 1471

Shortly after *Nelson* was decided, the D.C. Circuit analyzed § 1605(a)(2) in *Cicippio v. Islamic Republic of Iran,* 30 F.3d 164 (D.C.Cir.1994). Joseph Cicippio was abducted in Lebanon by Islamic terrorists. After his release he filed a suit against Iran, alleging that the terrorists were Iranian agents. Although Iran enjoyed immunity under the FSIA, Cicippio sought to invoke the commercial activity exception. Cicippio argued that because the hostage taking was intended to "gain economic advantages" it constituted a commercial activity. *Id.* at 166.

However, relying on the FSIA, *Weltover*, and *Nelson*, the court refused to consider the motives behind the kidnapping, and focused instead on the issue of whether "hostage taking itself can be described as a commercial activity—without regard to its purpose." *Id.* at 167. Consistent with the FSIA, and without eschewing the directives of *Weltover* and *Nelson*, the court found that "[a]lthough the purpose and perhaps the illegal character of the alleged acts are irrelevant in judging their commercial character, ... the context in which the acts take place must be germane." *Id.* at 168. The FSIA, the court observed, "was obviously designed to prevent the foreign sovereign from casting a governmental purpose, which always can be found, as a cloak of protection over typical commercial activities, not to reach out to cover all sorts of alleged nefarious acts." *Id.* Given this framework, the court concluded that the alleged kidnapping was not a commercial act within the meaning of the FSIA.[6]

Applying the standards set forth in 28 U.S.C. § 1603(d), *Weltover*, and *Nelson*, this court agrees with Japan and the United States that plaintiffs' claims do not arise in connection with a commercial activity. Although it is undeniable that prostitution and brothels routinely exist as commercial ventures engaged in by private parties, Japan's alleged conduct did not occur in this context. The complaint alleges that plaintiffs "were taken from their home countries occupied by Japan," and "pursuant to a premeditated master plan" forced into sexual slavery. Compl. ¶ 1. Plaintiffs further allege that this system "was planned, ordered, established, and controlled by Japan for the benefit of its soldiers and certain others." *Id.* ¶ 27. According to plaintiffs, the "comfort stations" were buildings near the front lines of the war that "were either appropriated by the Japanese military or makeshift constructions built by the army specifically to house 'comfort women'" *Id.* ¶ 26. Many of the "comfort women" were abducted from their homes, "often in large scale raids in countries under Japanese control." *Id.* ¶ 25. Plaintiffs even acknowledge that "[t]he 'comfort women' system required the deployment of the vast infrastructure and resources that were at the government's disposal, including soldiers and support personnel, weapons, all forms of land and sea transportation, and engineering and construction crews and material." *Id.* ¶ 56.

The described conduct is unquestionably barbaric, but certainly is not commercial in nature. Japan's use of its war-time military to impose "a premeditated master plan" of sexual slavery upon the women of occupied Asian countries might be characterized properly as a war crime or a crime against humanity. This conduct, however, was not in connection with a commercial activity.[7] As plaintiffs correctly recognize, this system "required" the resources at the government's disposal. Such conduct is not typically engaged in by private players in the market.

---

**6.** Ultimately Cicippio did bring a successful suit against Iran, but only after Congress amended the FSIA in 1996 by adding an exception permitting suits against countries designated as state sponsors of terrorism. *See* 28 U.S.C. § 1605(a)(7); *Cicippio v. Islamic Republic of Iran*, 18 F.Supp.2d 62 (D.D.C. 1998).

**7.** At oral argument plaintiffs' counsel also invoked the first clause of the commercial activity exception. The court will not address this issue because it was raised for the first time at oral argument. Needless to say, in light of the court's conclusion that the "comfort women" system was not a commercial activity, plaintiffs' position with respect to the first clause of § 1605(a)(2) would also fail.

Plaintiffs seek to avoid this conclusion by alleging that "soldiers using the 'comfort women' were normally charged a fixed price" and that "a portion of the revenue was taken by the military." *Id.* ¶ 55. This argument, too, must be rejected. The mere fact that soldiers allegedly paid money in order to access "comfort stations," is insufficient to justify characterizing the challenged conduct as commercial in nature. As the D.C. Circuit noted in *Cicippio*, the fact that ransom "was allegedly sought from relatives of the hostages could not make an ordinary kidnapping a commercial act any more than murder by itself would be treated as a commercial activity merely because the killer is paid." *Cicippio*, 30 F.3d at 168. Here, as in *Nelson*, the challenged conduct "boils down" to an abuse—albeit an extremely outrageous and inhumane one—of Japan's military power, an activity that is "peculiarly sovereign in nature." *Nelson*, 507 U.S. at 362, 113 S.Ct. 1471; *see also Doe v. Unocal Corp.*, 963 F.Supp. 880, 887–88 (C.D.Cal. 1997) (relying on *Nelson* to dismiss claims against the Burmese government where the plaintiffs alleged that the Government used violence, intimidation, and slavery in connection with a commercial pipeline project). Therefore, because the court concludes that Japan's operation of "comfort stations" was not a commercial activity within the meaning of the FSIA, the commercial activity exception does not apply in this case.[8]

Accordingly, as the court is persuaded that none of the exceptions to the FSIA relied upon by plaintiffs are applicable, Japan's motion to dismiss for lack of subject matter jurisdiction must be granted.

### C. Political Question Doctrine

Even if Japan did not enjoy sovereign immunity, this case must also be dismissed because it is nonjusticiable. Japan argues that plaintiffs' claims present a nonjusticiable political question. In its statement of interest the United States also argues that the political question doctrine requires dismissal.[9] The roots of the political question doctrine can be traced back to early federal jurisprudence. In *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 169, 2 L.Ed. 60 (1803), Chief Justice Marshall wrote for the Supreme Court that "[q]uestions, in their nature political ... can never be made in this court." Of course, this statement is not entirely accurate, as federal courts routinely adjudicate cases of a political nature. *See, e.g., Japan Whaling Ass'n v. American Cetacean Soc.*, 478 U.S. 221, 229, 106 S.Ct. 2860, 92 L.Ed.2d 166 (1986) (noting that "not every matter touching on politics is a political question").

The Supreme Court has articulated two primary justifications for the political question doctrine: "the appropriateness under our system of government of attributing finality to the action of the political

---

8. The court, therefore, need not determine whether Japan's alleged conduct caused a "direct effect" in the United States.

9. Although both Japan and the United States maintain that this case should be dismissed as a political question, the focus of their arguments is somewhat different. Japan first argues that "[c]laims for [w]ar [r]eparations [a]re [n]on-justiciable as a[m]atter of [l]aw," and that "individuals may not assert war-related claims except as authorized by a trea-

ty of peace." Def.'s Mot. to Dismiss at 16, 18. The United States, on the other hand, while also arguing that this case is a political question, does not rely on the proposition asserted by Japan that war reparations are always nonjusticiable. Like the United States, the court concludes based on the specific circumstances of this case that plaintiffs' claims are nonjusticiable, and therefore need not address Japan's position regarding the justiciability of war reparations in general.

departments and also the lack of satisfactory criteria for a judicial determination." *Baker v. Carr*, 369 U.S. 186, 210, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962) (quoting *Coleman v. Miller*, 307 U.S. 433, 454–55, 59 S.Ct. 972, 83 L.Ed. 1385 (1939)) (internal quotations omitted). The first of these considerations "is primarily a function of the separation of powers," *Baker*, 369 U.S. at 210, 82 S.Ct. 691, while the second is grounded in the inherent "limitation[s] of the judiciary as a decisional body." *Occidental of Umm al Qaywayn, Inc. v. A Certain Cargo of Petroleum*, 577 F.2d 1196, 1203 (5th Cir.1978).

Certain types of cases often have been found to present political questions. *See Baker*, 369 U.S. at 211–22, 82 S.Ct. 691. One such category is cases involving questions of foreign relations. It is well-established that "[t]he conduct of the foreign relations of our government is committed by the Constitution to the executive and legislative—'the political'—departments of the government, and the propriety of what may be done in the exercise of this political power is not subject to judicial inquiry or decision." *Oetjen v. Central Leather Co.*, 246 U.S. 297, 302, 38 S.Ct. 309, 62 L.Ed. 726 (1918). Accordingly, "many [foreign relations] questions uniquely demand single-voiced statement of the Government's views." *Baker*, 369 U.S. at 211, 82 S.Ct. 691 (citing *Doe v. Braden*, 57 U.S. (16 How.) 635, 657, 14 L.Ed. 1090 (1853)). The Supreme Court further has cautioned that decisions relating to foreign policy "are delicate, complex, and involve large elements of prophecy. They are and should be undertaken only by those directly responsible to the people whose welfare they advance or imperil. They are decisions of a kind for which the Judiciary has neither aptitude, facilities nor responsibility." *Chicago & S. Air Lines, Inc. v. Waterman S.S. Corp.*, 333 U.S. 103, 111, 68 S.Ct. 431, 92 L.Ed. 568 (1948).

However, it is equally clear that not all cases implicating foreign relations present political questions. *See Baker*, 369 U.S. at 211, 82 S.Ct. 691 (noting that it is "error to suppose that every case or controversy which touches foreign relations lies beyond judicial cognizance"). For example, courts certainly possess "the authority to construe treaties and executive agreements." *Japan Whaling Ass'n*, 478 U.S. at 230, 106 S.Ct. 2860. Further guidance in determining what constitutes a political question comes from *Baker v. Carr*, in which the Supreme Court announced six factors that must be considered when deciding if a case presents a political question. In *Baker* the Court held that:

> Prominent on the surface of any case held to involve a political question is found a textually demonstrable constitutional commitment of the issue to a coordinate political department; *or a lack of judicially discoverable and manageable standards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion;* or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or an unusual need for unquestioning adherence to a political decision already made; or the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

*Baker*, 369 U.S. at 217, 82 S.Ct. 691 (emphasis added). If any of these six factors "is inextricable from the case at bar," then "dismissal for non-justiciability on the ground of a political question's presence" is appropriate. *Id.* In *Goldwater v. Carter*, Justice Powell summed up the *Baker* criteria as follows: "(i) Does the issue involve resolution of questions committed by the

text of the Constitution to a coordinate branch of Government? (ii) Would resolution of the question demand that a court move beyond areas of judicial expertise? (iii) Do prudential considerations counsel against judicial intervention?" *Goldwater v. Carter*, 444 U.S. 996, 998, 100 S.Ct. 533, 62 L.Ed.2d 428 (1979) (Powell, J., concurring); *see also Antolok v. United States*, 873 F.2d 369, 381 (D.C.Cir.1989) (applying the analysis discussed by Justice Powell in *Goldwater*).

■ Although adjudication of the present case would certainly implicate United States foreign policy, this fact alone does not justify dismissal. However, prudential concerns together with the court's lack of judicial expertise strongly militate in favor of dismissal. While to some extent each of the factors identified in *Baker* is inextricable from the present case, there can be no doubt that resolution of plaintiffs' claims would require "an initial policy determination of a kind clearly for nonjudicial discretion," and be hindered by a "lack of judicially discoverable and manageable standards for resolving it." *Baker*, 369 U.S. at 217, 82 S.Ct. 691. Not only would the court have to move beyond its "judicial expertise," but "prudential considerations counsel against judicial intervention." *Goldwater*, 444 U.S. at 998, 100 S.Ct. 533 (Powell, J., concurring).

Thirty-five years ago the D.C. Circuit was confronted with a case that presented a similar dilemma. In *Kelberine v. Societe Internationale*, 363 F.2d 989 (D.C.Cir. 1966), two United States citizens brought a lawsuit seeking reparations for damages caused by the Nazis during World War II. After the war the United States Government was in possession of various assets that had previously belonged to companies that participated in the "Nazi conspiracy." *Kelberine*, 363 F.2d at 991–92. One such company, Interhandel, sued to recover this property. The government ultimately agreed that some of the property belonging to Interhandel would be sold at auction. The auction occurred, and Interhandel was due to receive a payment. On behalf of themselves and other victims of the Nazi atrocities, the plaintiffs sued to stop this payment. They argued that the auction proceeds should have been redirected to the victims of the Nazi regime.

In affirming the district court's dismissal of the complaint the D.C. Circuit reasoned in part that the plaintiffs' "thesis is not presently susceptible of judicial implementation." *Id.* at 995. Although the court's opinion did not explicitly cite *Baker v. Carr*, its conclusion was premised on the reality that

[a]s presently framed, the problem is not within the established scope of judicial authority. It did not arise under the Constitution or laws of the United States, or within the territorial jurisdiction of the courts of the United States.... The span between the doing of the damage and the application of the claimed assuagement is too vague. The time is too long. The identity of the alleged tort feasors is too indefinite. The procedure sought—adjudication of some two hundred thousand claims for multifarious damages inflicted twenty to thirty years ago in a European area by a government then in power—is too complicated, too costly, to justify undertaking by a court without legislative provision of the means wherewith to proceed.

*Id.* This rationale is even more persuasive now, decades later, when plaintiffs seek to adjudicate conduct sixty to seventy years after it occurred. Additionally, unlike in *Kelberine* where the defendant was a corporation, here the defendant is the Government of Japan.

As the United States points out in its papers, "[t]he history of Japan's war claims settlements with the United States and its allies, including the Philippines,

and various Chinese and Korean political entities is complex." U.S. St. of Interest at 23. The 1951 Treaty of Peace with Japan resolved all "claims of the Allied Powers and their nationals arising out of any actions taken by Japan and its nationals in the course of the prosecution of the war." Treaty of Peace with Japan, Sept. 8, 1951, 3 U.S.T. 3169, art. 14(b), T.I.A.S. No. 2490. The Philippines signed and ratified this agreement, thereby settling the claims of its nationals. Japan, as it was required to do pursuant to the 1951 Treaty of Peace, subsequently entered into agreements with other nations as well. *See* U.S. St. of Interest at 25–28 Specifically, Korea and China both negotiated separate agreements addressing war claims. *See id.* Although as plaintiffs argue the claims of the "comfort women" might not have been specifically mentioned in these treaties, the series of treaties signed after the war was clearly aimed at resolving all war claims against Japan.

There is no question that this court is not the appropriate forum in which plaintiffs may seek to reopen those discussions nearly a half century later. Just as the agreements and treaties made with Japan after World War II were negotiated at the government-to-government level, so too should the current claims of the "comfort women" be addressed directly between governments. Several district courts have recently reached this same conclusion with respect to reparations for victims of the Nazi regime. These courts concluded that "the post-war claims settlement regime had been exclusively constructed by political branches, and that it was not the place of courts to resolve [these] claims." *In re Nazi Era Cases Against German Defendants Litigation,* 129 F.Supp.2d. 370, 377–78 (D.N.J.2001); *see also Burger–Fischer v. DeGussa AG,* 65 F.Supp.2d 248 (D.N.J. 1999) (holding that certain claims of World War II slave laborers present nonjusticiable political questions); *Iwanowa v. Ford Motor Co.,* 67 F.Supp.2d 424 (D.N.J.1999) (same). Although the cases addressing reparations for victims of Nazi atrocities arose in a slightly different factual context than that of the "comfort women," the result nonetheless remains the same. The court therefore concludes that even if Japan did not enjoy sovereign immunity, plaintiffs' claims are nonjusticiable and must be dismissed.

### III. CONCLUSION

For the foregoing reasons, this court is unable to provide plaintiffs the redress they seek and surely deserve. Consequently, Japan's motion to dismiss is granted. An appropriate order accompanies this memorandum.

### JUDGMENT

Pursuant to Fed.R.Civ.P. 58 and for the reasons stated by the court in its memorandum opinion docketed this same day, it is this 4th day of October, 2001, hereby

**ORDERED and ADJUDGED** that defendant's motion to dismiss is granted and the complaint in this case is **DISMISSED.**