# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued March 22, 2005                    Decided June 28, 2005

No. 01-7169

HWANG GEUM JOO, ET AL.,
APPELLANTS

v.

JAPAN, MINISTER YOHEI KONO, MINISTER OF FOREIGN
AFFAIRS,
APPELLEE

———

On Remand from the U.S. Supreme Court

———

*Agnieszka M. Fryszman* argued the cause for appellants. With her on the briefs were *Michael D. Hausfeld*, *Barry A. Fisher*, *David Grosz*, and *Bill Lann Lee*.

*Jenny S. Martinez* argued the cause for *amici curiae* Askin, et al. in support of appellants. With her on the brief were *David A. Handzo* and *Richard Heideman*.

*Craig A. Hoover* argued the cause for appellee. With him on the brief were *Jonathan S. Franklin* and *Lorane F. Hebert*.

*Sharon Swingle*, Attorney, U.S. Department of Justice, argued the cause for *amicus curiae* United States of America in

support of appellee. With her on the brief were *Peter D. Keisler*, Assistant Attorney General, *Kenneth L. Wainstein*, U.S. Attorney, and *Mark B. Stern*, Attorney.

Before: GINSBURG, *Chief Judge*, and SENTELLE and TATEL, *Circuit Judges*.

Opinion for the Court filed by *Chief Judge* GINSBURG.

GINSBURG, *Chief Judge*: We again review the district court's dismissal of the appellants' complaint alleging Japanese soldiers "routinely raped, tortured ... [and] mutilated" them, along with thousands of other women, in occupied countries before and during World War II. *Hwang Geum Joo v. Japan*, 332 F.3d 679, 681 (D.C. Cir. 2003). The case returns to us now on remand from the Supreme Court. Having had the benefit of further briefing and argument, we affirm the judgment of the district court on the ground that the case presents a nonjusticiable political question, namely, whether the governments of the appellants' countries foreclosed the appellants' claims in the peace treaties they signed with Japan.

## I. Background

The facts of this case are set forth in our previous opinion, *id*. at 680-81. In brief, the appellants are 15 women from China, Taiwan, South Korea, and the Philippines; in 2000 they sued Japan in the district court under the Alien Tort Statute, 28 U.S.C. § 1350, "seeking money damages for [allegedly] having been subjected to sexual slavery and torture before and during World War II," in violation of "both positive and customary international law." 332 F.3d at 680, 681.

The district court dismissed the appellants' complaint, *Hwang Geum Joo v. Japan*, 172 F. Supp. 2d 52, 63 (D.D.C.

2001), concluding first that Japan's alleged activities did not "arise in connection with a commercial activity" and therefore did not fall within the commercial activity exception in the Foreign Sovereign Immunities Act (FSIA), 28 U.S.C. § 1605(a)(2). Accordingly, the district court did not consider the second requirement for jurisdiction under that exception -- that "Japan's alleged conduct caused a 'direct effect' in the United States." 172 F. Supp. 2d at 64 n.8. The district court went on to hold in the alternative that the complaint presents a nonjusticiable political question, noting that "the series of treaties signed after the war was clearly aimed at resolving all war claims against Japan." *Id*. at 67.

We affirmed on the ground that Japan would have been afforded absolute immunity from suit in the United States at the time of the alleged activities, 332 F.3d at 685, and that the Congress did not manifest a clear intent for the commercial activity exception to apply retroactively to events prior to May 19, 1952, when the State Department first espoused the restrictive theory of immunity later codified in the FSIA, *id*. at 686. The Supreme Court, however, held in *Republic of Austria v. Altmann*, 541 U.S. 677, 699 (2004), that the FSIA applies to all cases filed thereunder "regardless of when the underlying conduct occurred." Accordingly, the Court granted the appellants' petition for a writ of certiorari, vacated our judgment, and remanded the case to this court for further consideration in light of *Altmann*. *Hwang Geum Joo v. Japan*, 124 S. Ct. 2835 (2004).

## II. Analysis

The appellants again urge this court to reverse the district court's holding that their claims are not "based upon ... act[s] ... in connection with a commercial activity," 28 U.S.C. § 1605(a)(2), and to remand the case to the district court for it to

decide in the first instance whether Japan's alleged actions "cause[d] a direct effect in the United States." *Id*. Japan, and the United States as amicus curiae, again argue that Japan enjoys sovereign immunity because its alleged activities were not commercial and, in any event, that the appellants' complaint presents a nonjusticiable political question.

As explained below, we agree with the latter argument and therefore do not address the issue of sovereign immunity. The appellants, however, citing *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83 (1998), contend that "[b]efore reaching [the] political question [doctrine], this [c]ourt must establish jurisdiction" under the FSIA. We turn first to that issue.

A. The Order of Proceeding

As the Supreme Court stated in *Steel Co.*, "For a court to pronounce upon the meaning ... of a state or federal law when it has no jurisdiction to do so is, by very definition, for a court to act ultra vires." 523 U.S. at 101-02. The court must therefore "address questions pertaining to its or a lower court's jurisdiction before proceeding to the merits." *Tenet v. Doe*, 125 S. Ct. 1230, 1235 n.4 (2005).

The appellants apparently assume, but point to no authority suggesting, a dismissal under the political question doctrine is an adjudication on the merits. That is not how the Supreme Court sees the matter:

> [T]he concept of justiciability, which expresses the jurisdictional limitations imposed upon federal courts by the 'case or controversy' requirement of Art. III, embodies ... the ... political question doctrine[] .... [T]he presence of a political question [thus] suffices to prevent the power of

the federal judiciary from being invoked by the complaining party.

*Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 215 (1974).

Moreover, *Steel Co.* "does not dictate a sequencing of jurisdictional issues." *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 584 (1999) (within court's discretion to address personal jurisdiction before subject-matter jurisdiction); *see also Toca Producers v. FERC*, No. 04-1135, Slip. Op. at 5 (D.C. Cir. 2005) (addressing ripeness before standing). Rather, as this court held *In re Papandreou*, "a court that dismisses on other non-merits grounds such as *forum non conveniens* and personal jurisdiction, before finding subject-matter jurisdiction, makes no assumption of law-declaring power that violates the separation of powers principles underlying ... *Steel Company*." 139 F.3d 247, 255 (1998). As the Supreme Court stated in *Tenet*, "application of the *Totten* rule of dismissal, [92 U.S. 105 (1876),] like the abstention doctrine of *Younger v. Harris*, 401 U.S. 37 (1971), or the prudential standing doctrine, represents the sort of 'threshold question' we have recognized may be resolved before addressing jurisdiction." 125 S. Ct. at 1235 n.4. Likewise, we need not resolve the question of the district court's subject-matter jurisdiction under 28 U.S.C. § 1330 -- that is, whether Japan is entitled to sovereign immunity under the FSIA, *see Creighton Ltd. v. Gov't of the State of Qatar*, 181 F.3d 118, 121 (D.C. Cir. 1999) (the FSIA "is the sole basis for obtaining jurisdiction over a foreign state in our courts") -- before considering whether the complaint presents a nonjusticiable political question, *see Ruhrgas*, 526 U.S. at 585 ("It is hardly novel for a federal court to choose among threshold grounds for denying audience to a case on the merits").

B.  The Political Question Doctrine

The War in the Pacific has been over for 60 years, and Japan has long since signed a peace treaty with each of the countries from which the appellants come. The appellants maintain those treaties preserved, and Japan maintains they extinguished, war claims made by citizens of those countries against Japan. As explained below, our Constitution does not vest the authority to resolve that dispute in the courts. Rather, we defer to the judgment of the Executive Branch of the United States Government, which represents, in a thorough and persuasive Statement of Interest, that judicial intrusion into the relations between Japan and other foreign governments would impinge upon the ability of the President to conduct the foreign relations of the United States.

*Baker v. Carr*, 369 U.S. 186 (1962), remains the starting point for analysis under the political question doctrine. There the Supreme Court explained that "[p]rominent on the surface of any case held to involve a political question is found" at least one of six factors, the first of which is "a textually demonstrable constitutional commitment of the issue to a coordinate political department ...." *Id*. at 217.[*] Of course, questions concerning foreign relations "frequently ... involve the exercise of a discretion demonstrably committed to the executive or

---

[*]Other factors that indicate a political question, the Court in *Baker* explained, are: "a lack of judicially discoverable and manageable standards for resol[ution]; or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or an unusual need for unquestioning adherence to a political decision already made; or the potentiality of embarrassment from multifarious pronouncements by various departments on one question." *Id*.

legislature"; the Court cautioned, however, that "it is error to suppose that every case or controversy which touches foreign relations lies beyond judicial cognizance." *Id*. at 211. Courts are therefore to focus their analysis upon "the particular question posed, in terms of the history of its management by the political branches." *Id*.

The Supreme Court has recently given further direction more closely related to the legal and factual circumstances of this case: A policy of "case-specific deference to the political branches" may be appropriate in cases brought under the Alien Tort Statute. *Sosa v. Alvarez-Machain*, 124 S. Ct. 2739, 2766 n.21 (2004). In *Sosa*, the Court took note of certain class actions seeking damages for those injured by "the regime of apartheid that formerly controlled South Africa"; in each case the United States had filed a Statement of Interest counseling dismissal because prosecution of the case would interfere with South Africa's policy of "deliberately avoid[ing] a 'victors' justice' approach to the crimes of apartheid" in favor of "confession and absolution ... reconciliation, reconstruction, reparation and goodwill." *Id*. "In such cases," the Court explained, "there is a strong argument that federal courts should give serious weight to the Executive Branch's view of the case's impact on foreign policy." *Id*. Similarly, the Court in *Altmann* noted that a Statement of Interest concerning "the implications of exercising jurisdiction over [a] particular [foreign government] in connection with [its] alleged conduct ... might well be entitled to deference as the considered judgment of the Executive on a particular question of foreign policy." 541 U.S. at 702; see also *id*. at 714 (Breyer, J., concurring) (citing district court's opinion in this case).

With these principles in mind, we turn to "the particular question posed" in this case, *Baker*, 369 U.S. at 211, namely, whether the series of treaties Japan concluded in order to secure

the peace after World War II foreclosed the appellants' claims. As we explained in our previous opinion, Article 14 of the 1951 Treaty of Peace between Japan and the Allied Powers, 3 U.S.T. 3169, "expressly waives ... 'all claims of the Allied Powers and their nationals arising out of any actions taken by Japan and its nationals in the course of the prosecution of the war.'" 332 F.3d at 685.

The appellants from China, Taiwan, and South Korea argue that because their governments were not parties to the 1951 Treaty, the waiver of claims provision in Article 14 did not extinguish their claims. Neither, they argue, did the subsequent agreements between Japan and the governments of their countries. Although the appellants acknowledge that "it may seem anomalous that aliens may sue where similar claims of U.S. nationals are waived," they argue "that is precisely the result contemplated by ... the [Alien Tort Statute], 28 U.S.C. § 1350."*

"Anomalous" is an understatement. *See* Statement of Interest of the United States at 28 ("it manifestly was not the

---

* Despite the district court's having dismissed their complaint on the ground that "the series of treaties signed after the war was clearly aimed at resolving all war claims against Japan" and that a United States "court is not the appropriate forum in which plaintiffs may seek to reopen those discussions," 172 F. Supp. 2d at 67, the appellants argue for the first time in their post-remand Supplemental Reply Brief that because they allege injuries dating back to 1931, their claims did not arise solely from "the prosecution of the war," which in Article 8(a) of the 1951 Treaty is defined as having begun on September 1, 1939, the day Germany invaded Poland. This argument, raised for the first time in the appellants' fourth and final brief on appeal, comes far too late for the court to consider, *cf. Sierra Club v. EPA*, 292 F.3d 895, 900 (D.C. Cir. 2002) ("our caselaw makes clear that an argument first made in the reply comes too late").

intent of the President and Congress to preclude Americans from bringing their war-related claims against Japan ... while allowing federal or state courts to serve as a venue for the litigation of similar claims by non-U.S. nationals"). Even if we assume, however, as the appellants contend, that the 1951 Treaty does not of its own force deprive the courts of the United States of jurisdiction over their claims, it is pellucidly clear the Allied Powers intended that all war-related claims against Japan be resolved through government-to-government negotiations rather than through private tort suits. Indeed, Article 26 of the Treaty obligated Japan to enter "bilateral" peace treaties with non-Allied states "on the same or substantially the same terms as are provided for in the present treaty," which indicates the Allied Powers expected Japan to resolve other states' claims, like their own, through government-to-government agreement. To the extent the subsequent treaties between Japan and the governments of the appellants' countries resolved the claims of their respective nationals, the 1951 Treaty at a minimum obliges the courts of the United States not to disregard those bilateral resolutions.

First, the Republic of the Philippines, as an Allied Power, was a signatory to the 1951 Treaty itself and thus at least purported to waive the claims of its nationals. 136 U.N.T.S. at 137, ratified 260 U.N.T.S. 450. Then in 1952 Japan reached an agreement with the Republic of China (Taiwan), 138 U.N.T.S. 37, which did not expressly mention the settlement of individual claims but did state in Article XI that "[u]nless otherwise provided for in the present Treaty ... any problem arising between [the parties] as a result of the existence of a state of war shall be settled in accordance with the relevant provisions of the [1951] Treaty." In 1965 Japan and the Republic of Korea (South Korea) entered into an agreement providing that "the problem concerning property, rights, and interests of the two Contracting Parties and their nationals ... and concerning claims

between the Contracting Parties and their nationals ... is settled completely and finally." 583 U.N.T.S. 258, 260 (Art. II, § 1). Finally, in 1972 Japan and the People's Republic of China issued a Joint Communiqué in which China "renounce[d] its demand for war reparation from Japan," and in 1978 Japan and China affirmed in a formal treaty of peace that "the principles set out in [the Joint Communiqué] should be strictly observed." 1225 U.N.T.S. 269.

As evidenced by the 1951 Treaty itself, when negotiating peace treaties,

> governments have dealt with ... private claims as their own, treating them as national assets, and as counters, 'chips', in international bargaining. Settlement agreements have lumped, or linked, claims deriving from private debts with others that were intergovernmental in origin, and concessions in regard to one category of claims might be set off against concessions in the other, or against larger political considerations unrelated to debts.

Louis Henkin, *Foreign Affairs and the Constitution* 300 (2d edition 1996); *see Dames and Moore v. Regan*, 453 U.S. 654, 688 (1981) (upholding President's authority to settle claims of citizens as "a necessary incident to the resolution of a major foreign policy dispute between our country and another [at least] where ... Congress acquiesced in the President's action"); *Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 424 (2003) (acknowledging "President's authority to provide for settling claims in winding up international hostilities").

The governments of the appellants' countries apparently had the authority -- at least the appellants do not contest the point -- to bargain away their private claims in negotiating a peace with Japan and, as we noted previously, it appears "in fact

[they] did." 332 F.3d at 685. Indeed, Professor Henkin reports that "except as an agreement might provide otherwise, international claim settlements generally wipe out the underlying private debt, terminating any recourse under domestic law as well." *Above* at 300. The Supreme Court first expressed the same understanding with respect to the Treaty of Paris ending the War of Independence, which expressly provided for the preservation of private claims. In *Ware v. Hylton*, 3 U.S. (3 Dall.) 199, 230 (1796), a case brought by a British subject to recover a debt confiscated by the Commonwealth of Virginia during the war, Justice Chase wrote:

> I apprehend that the treaty of peace abolishes the subject of the war, and that after peace is concluded, neither the matter in dispute, nor the conduct of either party, during the war, can ever be revived, or brought into contest again. All violencies, injuries, or damages sustained by the government, or people of either, during the war, are buried in oblivion; and all those things are implied by the very treaty of peace; and therefore not necessary to be expressed. Hence it follows, that the restitution of, or compensation for, British property confiscated, or extinguished, during the war, by any of the United States, could only be provided for by the treaty of peace; and *if there had been no provision, respecting these subjects, in the treaty*, they could not be agitated after the treaty, by the British government, much less by her subjects in courts of justice. (Emphasis supplied).

Contrary to that principle, the appellants insist the treaties between Japan and Taiwan, South Korea, and China preserved the claims of individuals by failing to mention them (a claim that would be untenable with respect to the Philippines). Japan does not agree, nor does the Department of State, which takes the position that "[t]he plaintiffs' governments ... chose to

resolve those claims through international agreements with Japan." Statement of Interest at 31. In order to adjudicate the plaintiffs' claims, the court would have to resolve their dispute with Japan over the meaning of the treaties between Japan and Taiwan, South Korea, and China, which, as the State Department notes in arguing this case is nonjusticiable, would require the court to determine "the effects of those agreements on the rights of their citizens with respect to events occurring outside the United States." *Id*.

The question whether the war-related claims of foreign nationals were extinguished when the governments of their countries entered into peace treaties with Japan is one that concerns the United States only with respect to her foreign relations, the authority for which is demonstrably committed by our Constitution not to the courts but to the political branches, with "the President [having] the 'lead role.'" *Garamendi*, 539 U.S. at 423 n.12. And with respect to that question, the history of management by the political branches, *Baker*, 369 U.S. at 211, is clear and consistent: Since the conclusion of World War II, it has been the foreign policy of the United States "to effect as complete and lasting a peace with Japan as possible by closing the door on the litigation of war-related claims, and instead effecting the resolution of those claims through political means." Statement of Interest at 29; *see also* S. Rep. No. 82-2, 82d Cong., 2d Sess. 12 (1952) ("Obviously insistence upon the payment of reparations in any proportion commensurate with the claims of the injured countries and their nationals would wreck Japan's economy, dissipate any credit that it may possess at present, destroy the initiative of its people, and create misery and chaos in which the seeds of discontent and communism would flourish"); *Aldrich v. Mitsui & Co. (USA)*, Case No. 87-912-Civ-J-12, Slip Op. at 3 (M.D. Fla. Jan. 20, 1988) (following State Department's recommendation to dismiss private claim as barred by 1951 Treaty); *In re World War II Era Japanese*

*Forced Labor Litigation*, 114 F. Supp. 2d 939, 946-48 (N. D. Cal. 2000) (same).

It is of course true, as the appellants point out, that in general "the courts have the authority to construe treaties and executive agreements," *Japan Whaling Ass'n v. Am. Cetacean Soc'y*, 478 U.S. 221, 230 (1986); *see also Ungaro-Benages v. Dresdner Bank AG*, 379 F.3d 1227, 1235-36 (11th Cir. 2004). At the same time, the Executive's interpretation of a treaty is ordinarily entitled to "great weight," *Sumitomo Shoji Am., Inc. v. Avagliano*, 457 U.S. 176, 184-85 (1982).

Here, however, the United States is not a party to the treaties the meaning of which is in dispute, and the Executive does not urge us to adopt a particular interpretation of those treaties. Rather, the Executive has persuasively demonstrated that adjudication by a domestic court not only "would undo" a settled foreign policy of state-to-state negotiation with Japan, but also could disrupt Japan's "delicate" relations with China and Korea, thereby creating "serious implications for stability in the region." Statement of Interest at 34-35. Consider: According to the appellants the Republic of Korea does not agree with Japan's understanding that the treaty between them extinguished the appellants' claims against Japan. *See* Reply Brief of Appellants at 15 n.14 (quoting Korean Foreign Minister as saying that "it is the government's position that the [Treaty of 1965] does not have any effect on individual rights to bring claims or lawsuits," Decl. of Prof. Chang Rok Kim, Pls.' Opp. Mot. Dismiss. Ex. 2 at 12). Is it the province of a court in the United States to decide whether Korea's or Japan's reading of the treaty between them is correct, when the Executive has determined that choosing between the interests of two foreign states in order to adjudicate a private claim against one of them would adversely affect the foreign relations of the United States? Decidedly not. The Executive's judgment that

adjudication by a domestic court would be inimical to the foreign policy interests of the United States is compelling and renders this case nonjusticiable under the political question doctrine.

## III. Conclusion

We hold the appellants' complaint presents a nonjusticiable political question, namely, whether the governments of the appellants' countries resolved their claims in negotiating peace treaties with Japan. In so doing we defer to "the considered judgment of the Executive on [this] particular question of foreign policy." *Altmann*, 541 U.S. at 702; *Cf. Alperin v. Vatican Bank*, 405 F.3d 727, 755 (9th Cir. 2005) ("Condemning -- for its wartime actions -- a foreign government with which the United States was at war would require us to review an exercise of foreign policy judgment by the coordinate political branch to which authority to make that judgment has been constitutionally committed"). For the court to disregard that judgment, to which the Executive has consistently adhered, and which it persuasively articulated in this case, would be imprudent to a degree beyond our power.

Accordingly, as we said when this case was previously before us, "much as we may feel for the plight of the appellants, the courts of the United States simply are not authorized to hear their case." 332 F.3d at 687. For the foregoing reasons, the judgment of the district court is

*Affirmed*.