Notice: This opinion is subject to formal revision before publication in the Federal Reporter or U.S.App.D.C. Reports. Users are requested to notify the Clerk of any formal errors in order that corrections may be made before the bound volumes go to press.

# United States Court of Appeals

FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued December 10, 2002   Decided June 27, 2003

No. 01-7169

HWANG GEUM JOO, ET AL.,
APPELLANTS

v.

JAPAN, MINISTER YOHEI KONO, MINISTER OF FOREIGN AFFAIRS,
APPELLEE

———

Appeal from the United States District Court
for the District of Columbia
(No. 00cv02233)

———

*Michael D. Hausfeld* argued the cause for appellants. With him on the briefs were *Agnieszka M. Fryszman, Elizabeth H. Cronise, Barry A. Fisher, David Grosz*, and *Bill Lann Lee*.

*Jenny S. Martinez* argued the cause for *amici curiae* Kelly Askin, et al., in support of appellants. With her on the brief

---

Bills of costs must be filed within 14 days after entry of judgment. The court looks with disfavor upon motions to file bills of costs out of time.

were *Michael Tigar, David A. Handzo*, and *Richard Heideman*.

*Craig A. Hoover* argued the cause for appellee. With him on the brief was *Jonathan S. Franklin.*

*Douglas Hallward–Driemeier*, Attorney, U.S. Department of Justice, argued the cause for *amicus curiae* United States of America, in support of appellee. With him on the brief were *Roscoe C. Howard, Jr.*, U.S. Attorney, and *Mark B. Stern*, Attorney, U.S. Department of Justice.

Before: GINSBURG, *Chief Judge*, and SENTELLE and TATEL, *Circuit Judges*.

Opinion for the court filed by *Chief Judge* GINSBURG.

GINSBURG, *Chief Judge*: The appellants are 15 women from China, Taiwan, South Korea, and the Phillippines; they brought this suit against Japan, seeking money damages for having been subjected to sexual slavery and torture before and during World War II. The district court held Japan immune from suit pursuant to the Foreign Sovereign Immunities Act of 1976, 28 U.S.C. §§ 1330, 1602–1611, because it had not waived its immunity and the conduct alleged did not come within the commercial activity exception to the FSIA. The district court also held the suit was barred under the political question doctrine.

We affirm the judgment of the district court. Under the FSIA Japan is entitled to immunity from suit concerning the pre–1952 acts alleged in this case. We reject the appellants' argument that violation of a *jus cogens* norm constitutes a waiver of sovereign immunity.

## I. Background

The appellants allege that between 1931 and 1945 the Government of Japan abducted, coerced, or deceived them and a large number of other girls and women from occupied territories to serve as "comfort women," a euphemism for sex slaves, at so-called "comfort stations" near the front lines of the war, where the women were routinely raped, tortured,

beaten, mutilated, and in some cases murdered. The appellants assert that these comfort stations were operated by the Japanese Army, which charged soldiers a fee for access to the women.

Only in 1992 did the Government of Japan acknowledge having had any involvement with the comfort stations, which it had previously attributed to entrepreneurs who employed "voluntary prostitutes." In 2000 the appellants filed a complaint in the district court invoking the Alien Tort Statute, 28 U.S.C. § 1350, and alleging that Japan had violated both positive and customary international law. Japan filed a motion to dismiss the complaint on the ground of sovereign immunity, which motion the district court granted.

The district court determined that its jurisdiction over Japan, if any, must rest solely upon the FSIA. *Hwang Geum Joo v. Japan*, 172 F.Supp.2d 52, 56 (D.D.C. 2001). Because that statute was not enacted until 1976, the court first considered whether the FSIA applies retroactively to the actions alleged in this case. *Id.* at 57–58. The district court did not reach a conclusion on that issue, however, instead holding that, even if the FSIA does govern the plaintiffs' claims, none of the exceptions to sovereign immunity provided in the FSIA applies. *Id.* at 58. The district court rejected the appellants' arguments that Japan had waived its immunity to suit in the United States, either explicitly by agreeing to the Potsdam Declaration – an argument abandoned on appeal – or implicitly by its commission of *jus cogens* violations, and that Japan's activities came within the commercial activity exception to the FSIA, 28 U.S.C. § 1605(a)(2). *Id.* at 64. The district court held in the alternative that the case must be dismissed because it presents a nonjusticiable political question. *Id.* at 67.

## II. Analysis

The appellants raise two potential sources of district court jurisdiction over their suit against Japan. First, they argue the commercial activity exception to the FSIA applies retroactively, and Japan's operation of "comfort stations" was a

commercial activity. Next, they contend Japan implicitly waived its sovereign immunity by violating *jus cogens* norms. Then, apparently assuming the courts have jurisdiction over Japan, they claim the Alien Tort Statute creates a cause of action for a violation of customary international law. Finally, the appellants argue the political question doctrine is inapplicable to this case.

We hold that the commercial activity exception does not apply retroactively to events prior to May 19, 1952; we therefore do not consider whether the "comfort stations" were a "commercial activity" within the meaning of the FSIA. In any event, the 1951 Treaty of Peace between Japan and the Allied Powers created a settled expectation on the part of Japan that it would not be sued in the courts of the United States for actions it took during the prosecution of World War II, and the Congress has done nothing that leads us to believe it intended to upset that expectation. As to whether a violation of *jus cogens* norms constitutes an implied waiver of sovereign immunity pursuant to 28 U.S.C. § 1605(a)(1), our holding in *Princz v. Federal Republic of Germany*, 26 F.3d 1166 (D.C. Cir. 1994), is dispositive and remains good law; it therefore binds this panel of the court, as the appellants recognize.

We need not decide whether the Alien Tort Statute creates a cause of action because it clearly does not confer jurisdiction over a foreign sovereign. Nor, because the district court did not have jurisdiction of this case pursuant to the FSIA, need we consider whether the political question doctrine would also bar its adjudication.

A. Retroactive Application of the Commercial Activity Exception to the FSIA

The FSIA, enacted in 1976, "provides the sole basis for obtaining jurisdiction over a foreign state in federal court." *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 439 (1989); *see Verlinden B.V. v. Central Bank of Nigeria*, 461 U.S. 480, 488 (1983) (FSIA contains "comprehensive set of legal standards governing claims of immunity in every civil action against a foreign state or its political

subdivisions, agencies, or instrumentalities"). We have previously laid out at some length the history of the United States' approach to foreign sovereign immunity in general, culminating in the passage of the FSIA, *see Princz*, 26 F.3d at 1169–71; here we concentrate specifically upon the commercial activity exception.

Prior to 1952, the courts of the United States generally followed the doctrine of "absolute immunity," *see Verlinden*, 461 U.S. at 486; Letter from Jack B. Tate, Acting Legal Advisor, Department of State, to Acting Attorney General Philip B. Perlman (May 19, 1952), reprinted in 26 Dept. of State Bull. 984–85 (1952), and in *Alfred Dunhill of London, Inc. v. Cuba*, 425 U.S. 682, 711 (1976) (Appendix 2 to opinion of White, J.); that is, the courts almost always held a foreign sovereign immune from suit. *See Verlinden*, 461 U.S. at 486 ("foreign sovereign immunity is a matter of grace and comity on the part of the United States, and not a restriction imposed by the Constitution. Accordingly, this Court consistently has deferred to the decisions of the political branches – in particular, those of the Executive Branch – on whether to take jurisdiction over actions against foreign sovereigns and their instrumentalities"). In 1952 the United States adopted the doctrine of "restrictive immunity," as set out in the Tate Letter and later codified in the FSIA. *See Verlinden*, 461 U.S. at 486–88. Under that doctrine "immunity is confined to suits involving the foreign sovereign's public acts, and does not extend to cases arising out of a foreign state's strictly commercial acts." *Verlinden*, 461 U.S. at 487. This distinction served as the basis for the commercial activity exception in the FSIA, which allows a suit against a foreign sovereign to proceed if:

> the action is based [1] upon a commercial activity carried on in the United States by the foreign state; or [2] upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or [3] upon an act outside the territory of the United States in connection with a commercial activity of the foreign

state elsewhere and that act causes a direct effect in the United States.

28 U.S.C. § 1605(a)(2). In this case the appellants invoke the first and third conditions, claiming in connection with the former that Japan operated some comfort stations in two occupied territories of the United States, namely, Guam and the Phillippines.

With this background in mind we consider whether 28 U.S.C. § 1605(a)(2) can be applied to events that occurred prior to 1952. This is a two-step inquiry. First, we must consider whether the commercial activity exception to the FSIA has retroactive effect.

> A statute has retroactive effect when it takes away or impairs vested rights acquired under existing laws, or creates a new obligation, imposes a new duty, or attaches a new disability, in respect to transactions or considerations already past. As we have repeatedly counseled, the judgment whether a particular statute acts retroactively should be informed and guided by familiar considerations of fair notice, reasonable reliance, and settled expectations.

*INS v. St. Cyr*, 533 U.S. 289, 321 (2001) (internal citations and quotation marks omitted). If we conclude the statute does not have a retroactive effect, then our inquiry ends and we apply the statute to events occurring prior to 1952. If, however, we determine the statute would have a retroactive effect, then we ask whether the "presumption against retroactive legislation that is deeply rooted in our jurisprudence" is overcome because the "Congress has clearly manifested its intent" to legislate retroactively. *Hughes Aircraft Co. v. United States ex rel. Schumer*, 520 U.S. 939, 946 (1997) (internal citations and quotation marks omitted).

1. Would the commercial activity exception have retroactive effect?

With respect to the first inquiry, we agree with Japan and the United States that application of the commercial activity

exception to events that occurred prior to 1952 would impose new obligations upon, come without fair notice to, and upset the settled expectations of, foreign sovereigns. We further agree with the United States that the Tate Letter shows the United States clearly changed its position in 1952 when it adopted the doctrine of restrictive immunity. Theretofore a foreign sovereign justifiably would have expected any suit in a court in the United States–whether based upon a public or a commercial act–to be dismissed unless the foreign sovereign consented to the suit.* As the Eleventh Circuit noted in a case involving a suit against the People's Republic of China for payment of defaulted bearer bonds issued by the Imperial Chinese Government in 1911:

> [T]o give the [FSIA] retrospective application to pre–1952 events would interfere with antecedent rights of other sovereigns (and also with antecedent principles of law that the United States followed until 1952). It would be manifestly unfair for the United States to modify the immunity afforded a foreign state in 1911 by the enactment of a statute nearly three quarters of a century later.

*Jackson v. People's Republic of China*, 794 F.2d 1490, 1497–98 (1986); *accord Carl Marks & Co., Inc. v. Union of Soviet Socialist Republics*, 841 F.2d 26, 27 (2d Cir. 1988) (per curiam) ("Such a retroactive application of the FSIA would affect adversely the USSR's settled expectation, rising to the

---

* Appellants argue that absolute immunity was generally accorded only to "friendly" foreign sovereigns in the pre–1952 era, *Verlinden*, 461 U.S. at 486, and that the State Department and courts would not have accorded Japan such status considering its posture in World War II. The Executive Branch, however, specifically decided to resolve all war-related claims against Japan through inter-governmental negotiations, *see infra* pages 9–10, and pre-FSIA courts would have considered themselves bound by a recommendation to accord Japan immunity from suit. *See, e.g., Republic of Mexico v. Hoffman*, 324 U.S. 30, 35 (1945) ("It is therefore not for the courts to deny an immunity which our government has seen fit to allow, or to allow an immunity on new grounds which the government has not seen fit to recognize").

level of an antecedent right, of immunity from suit in American courts") (citations omitted). We conclude that, because Japan had a settled expectation in the 1930s and 1940s that its commercial activities would not be subject to suit in a court of the United States, application of the commercial activity exception of the FSIA to acts occurring then would clearly be retroactive in effect.

For the contrary implication the appellants invoke a dictum in *Princz*. There we considered the possibility that application of the FSIA to pre–1952 events might not be of "genuinely retroactive effect," 26 F.3d at 1170 (internal citations and quotation marks omitted), because the statute is jurisdictional rather than substantive in nature and therefore "would just remove the bar of sovereign immunity to the plaintiff's vindicating his rights under [the substantive] law." *Id.* at 1171. We based this suggestion upon *Landgraf v. USI Film Products*, 511 U.S. 244, 274 (1994), quoting *Hallowell v. Commons*, 239 U.S. 506, 508 (1916), in which the Supreme Court had remarked that a statute affecting jurisdiction "takes away no substantive right, but simply changes the tribunal that is to hear the case."

The Supreme Court has since clarified the situation in *Hughes Aircraft*, where the issue was whether a 1986 amendment expanding the jurisdiction of the *qui tam* provision of the False Claims Act, 31 U.S.C. § 3730(b), could be applied to events occurring prior to 1986. 520 U.S. at 941–42. The Court held that, although the amendment affected only jurisdiction, its application in a suit concerning pre-enactment events would still have a retroactive effect:

> The 1986 amendment . . . does not merely allocate jurisdiction among forums. Rather, it *creates* jurisdiction where none previously existed; it thus speaks not just to the power of a particular court but to the substantive rights of the parties as well. Such a statute, even though phrased in "jurisdictional" terms, is as much subject to our presumption against retroactivity as any other.

*Id.* at 951 (emphasis in original). The commercial activity exception to the FSIA, by qualifying what previously had

been the absolute immunity of foreign sovereigns, also "creates jurisdiction where none previously existed" and therefore affects the substantive rights of the concerned parties.

We recognize the Ninth Circuit has recently held that the expropriation exception to the FSIA, 28 U.S.C. § 1605(a)(3), may be applied retroactively to activities of the German and Austrian governments in the 1930s and 1940s. *See Altmann v. Republic of Austria*, 317 F.3d 954 (2002). The Ninth Circuit reasoned "that the Austrians could not have had any expectation, much less a settled expectation, that the State Department would have recommended immunity as a matter of 'grace and comity' for the wrongful appropriation of Jewish property." *Id.* at 965.

The decisions of the Ninth Circuit are, of course, not binding on this court. Regardless whether we would follow the *Altmann* decision, we do not find its reasoning applicable to this case because of the 1951 Treaty of Peace with Japan signed by Japan and the Allied Powers. 3 U.S.T. 3169. As the United States represents in its brief as amicus curiae, the Treaty "embodies the foreign policy determination of the United States that all claims against Japan arising out of its prosecution of World War II are to be resolved through inter-governmental settlements." We agree that the Treaty manifests the parties' intent to resolve matters arising from World War II without involving the courts of the United States (or of any signatory nation). In any event, the interpretation of the Treaty offered by the United States is a reasonable one. *See Sumitomo Shoji Am., Inc. v. Avagliano*, 457 U.S. 178, 184–85 (1982) ("Although not conclusive, the meaning attributed to treaty provisions by the Government agencies charged with their negotiation and enforcement is entitled to great weight").

Article 14 of the Treaty expressly waives "all . . . claims of the Allied Powers and their nationals arising out of any actions taken by Japan and its nationals in the course of the prosecution of the war" in return for a reciprocal waiver of claims by Japan and the right of the Allied Powers to seize

Japanese assets within the Allies' respective jurisdictions. The Treaty further provides that Japan would resolve the war-related claims of other United Nations member states and their nationals "on the same or substantially the same terms," that is, through intergovernmental agreements, *see* Art. 26, as in fact it did. *See* Treaty of Peace Between the Republic of China and Japan, April 28, 1952, 138 U.N.T.S. 3; *see also* Agreement of the Settlement of Problems Concerning Property and Claims on the Economic Co-operation Between Japan and the Republic of Korea, June 22, 1965, 583 U.N.T.S. 173. As a result, Japan could not have expected to be sued in a court of the United States by either an Allied national or a Chinese or Korean national for a claim arising out of World War II because the Allied Powers had respectively waived the claims of their nationals and expressed a clear policy of resolving the claims of other nationals through government-to-government negotiation. As a matter of foreign policy it would be odd indeed for the United States, on the one hand, to waive all claims of its nationals against Japan and, on the other hand, to allow non-nationals to proceed against Japan in its courts. Because there was no similar treaty with Germany or Austria, and therefore no similar settled expectation, the opinion in *Altmann* is not relevant to the present case.

*Altmann* is not relevant to the present case for a second reason. In 1949 the State Department had issued a letter specifically stating that

> The policy of the Executive, with respect to claims asserted in the United States for the restitution of identifiable property (or compensation in lieu thereof) lost through force, coercion, or duress as a result of Nazi persecution in Germany, is to relieve American courts from any restraint upon the exercise of their jurisdiction to pass upon the validity of the acts of Nazi officials.

*Altmann*, 317 F.3d at 966 (quoting Letter from Jack B. Tate, Acting Legal Advisor, Department of State, to the Attorneys for the plaintiff in Civil Action No. 31–555 (S.D.N.Y.), *reprinted in Bernstein v. N.V. Nederlandsche–Amerikaansche*, 210

F.2d 375, 375–76 (2d Cir. 1954) (per curiam)). Appellants do not point out, and we are not aware of, any similar statement of policy regarding the alleged acts of Japan in this case. The lack of such a statement not only distinguishes this case from *Altmann*; it also gives us all the more reason to believe the Executive wanted to handle claims against Japan arising out of World War II solely at the level of inter-governmental negotiations.

2. Did the Congress clearly intend to legislate retroactively?

Because the commercial activity exception would, if applied to events before 1952, upset Japan's settled expectations, we must determine whether the Congress manifested a clear intent to overcome the presumption against retroactive legislation. We find no clear indication the Congress intended 28 U.S.C. § 1605(a)(2) to apply to events occurring prior to 1952. The appellants point out, as we observed *obiter* in *Princz*, that the decision of the Congress, concurrent with the passage of the FSIA, to delete from 28 U.S.C. § 1332 the provision for diversity jurisdiction over a suit brought by a United States citizen against a foreign government might suggest the FSIA was intended to have retroactive effect– "[u]nless one is to infer that the Congress intentionally but silently denied a federal forum for all suits against a foreign sovereign arising under federal law that were filed after enactment of the FSIA but based upon pre-FSIA facts." 26 F.3d at 1170. This point remains valid as applied to events occurring between 1952 and 1976. The Congress's decision to amend 28 U.S.C. § 1332 cannot provide a basis, however, for altering sovereign immunity as it existed prior to 1952. The most that can be said is that in enacting the FSIA the Congress intended to incorporate the doctrine of restrictive immunity into federal law, not that the doctrine be applied to events that occurred before the United States first adopted it.

The appellants' last argument for retroactivity is based upon a sentence in the preamble of the FSIA: "Claims of foreign states to immunity should henceforth be decided by courts of the United States and of the States in conformity with the principles set forth in this chapter." 28 U.S.C.

§ 1602.  In *Princz* we observed that this statement "suggests that the FSIA is to be applied to all cases decided after its enactment, i.e. regardless of when the plaintiff's cause of action may have accrued."  26 F.3d at 1170.  The preambular sentence falls far short, however, of stating the "clear intent" of the Congress that the statute be applied retroactively to events occurring before 1952.  We agree with the United States that the most probable meaning of the sentence is that the State Department would no longer consider petitions for sovereign immunity – which it had done routinely until 1952, when it issued the Tate Letter, and sometimes thereafter, *see Verlinden*, 461 U.S. at 487 – because henceforth the question of immunity would be addressed solely by the courts applying the new statute.

We conclude that the commercial activity exception of the FSIA, 28 U.S.C. § 1605(a)(2), does not apply retroactively to events that predate the Tate Letter.  Therefore, we need not consider whether the acts alleged in this case constitute a "commercial activity" within the meaning of 28 U.S.C. § 1605(a)(2).

B.  Violation of a *Jus Cogens* Norm as a Waiver of Sovereign Immunity

The appellants argue that Japan impliedly waived its sovereign immunity by violating *jus cogens* norms against sexual trafficking.  "A *jus cogens* norm is a principle of international law that is accepted by the international community of States as a whole as a norm from which no derogation is permitted." *Princz*, 26 F.3d at 1173 (internal citations and quotation marks omitted).  In *Princz*, however, this court soundly rejected that argument when we construed the "intentionality requirement implicit in" the waiver provision of the FSIA, 28 U.S.C. § 1605(a)(1), to require "the foreign government's having at some point indicated its amenability to suit."  26 F.3d at 1174.  And a sovereign cannot realistically be said to manifest its intent to subject itself to suit inside the United States when it violates a *jus cogens* norm outside the United States.  *See id.*

The appellants therefore argue that we should revisit our decision in *Princz* due to intervening developments in inter-

national law. There is no need to revisit *Princz*, however; the fundamental premise of that decision – that a court cannot create a new exception to the general rule of immunity under the guise of an "implied waiver" – remains sound. *See id.* at 1174 n.1 ("something more nearly express is wanted before we impute to the Congress an intention that the federal courts assume jurisdiction over the countless human rights cases that might well be brought by the victims of all the ruthless military juntas, presidents-for-life, and murderous dictators of the world, from Idi Amin to Mao Zedong"). No Supreme Court or circuit case has questioned this court's interpretation of 28 U.S.C. § 1605(a)(1) with respect to the violation of a *jus cogens* norm; indeed, two other circuit courts have since followed it, *see Sampson v. Federal Republic of Germany*, 250 F.3d 1145, 1156 (7th Cir. 2001); *Smith v. Socialist People's Libyan Arab Jamahiriya*, 101 F.3d 239 (2d Cir. 1996); and this panel is in any event bound by it.

## C. The Alien Tort Statute

The appellants maintain, and Japan denies, that the Alien Tort Statute, 28 U.S.C. § 1350, creates a cause of action for a violation of customary international law. *Compare*, *e.g.*, *Kadic v. Karadzic*, 70 F.3d 232 (2d Cir. 1995), *with Al Odah v. United States*, 321 F.3d 1134, 1145–49 (D.C. Cir. 2003) (Randolph, J., concurring). We need not reach this question because, as Japan and the United States point out, whatever else the Alien Tort Statute might do, it does not provide the courts with jurisdiction over a foreign sovereign. Only the FSIA can provide such jurisdiction. *See Amerada Hess*, 488 U.S. at 438 ("We think that Congress' decision to deal comprehensively with the subject of foreign sovereign immunity in the FSIA, and the express provision in § 1604 that 'a foreign state shall be immune from the jurisdiction of the courts of the United States and of the States except as provided in sections 1605–1607,' preclude a construction of the Alien Tort Statute that permits the instant suit"); *Verlinden*, 461 U.S. at 488. The appellants, in a footnote to their reply brief, acknowledge what they could hardly deny. Having found no jurisdictional predicate under the FSIA, we have no

need to determine whether the ATS creates a cause of action for a violation of customary international law.

### III.   Conclusion

In sum, we hold only three things:  (1) the commercial activity exception to the FSIA does not apply retroactively to events, such as those alleged in this case, occurring before May 19, 1952, the date of the Tate Letter;  (2) in any event, the 1951 Treaty created a settled expectation, left undisturbed by the Congress, that Japan would not face suit in the courts of the United States for its actions during World War II;  and (3) a violation of *jus cogens* norms does not constitute an implied waiver of sovereign immunity under the FSIA. Much as we may feel for the plight of the appellants, the courts of the United States simply are not authorized to hear their case.   The judgment of the district court dismissing this case is, accordingly,

*Affirmed.*