KAVANAUGH, Circuit Judge,
dissenting.
I respectfully dissent. In my judgment, allowing this lawsuit to proceed is inconsistent with bedrock principles of judicial restraint that the Supreme Court and this Court have articulated in cases touching on the foreign policy and foreign relations of the United States.
Citing the Alien Tort Statute and international law (and in some cases also state law and the Torture Victim Protection Act of 1991), foreign citizens have begun bringing human rights lawsuits against multinational corporations in U.S. courts. See, e.g., Doe v. Unocal Corp., 963 F.Supp. 880, 883-84 (C.D.Cal.1997) (considered to be first such case). The complaints often allege corporate complicity in various human rights violations committed by foreign government officials against foreign citizens in foreign countries (some cases allege direct corporate wrongdoing not involving foreign government officials). Particularly because many of these lawsuits directly or indirectly target actions of foreign government officials, they frequently raise sensitive foreign policy issues for the United States.
In this case, 11 Indonesian citizens sued Exxon; plaintiffs claim they were injured in Indonesia by members of the Indonesian military who provide security for Exxon in Indonesia. The Government of Indonesia has objected to the case as an intrusion on its sovereignty. And the Executive Branch has stated that the lawsuit will adversely affect the foreign policy interests of the United States — particularly U.S. relations with Indonesia, which is the largest Muslim nation in the world and has worked closely with the United States since September 11, 2001, in the ongoing war against al Qaeda and related radical Islamic terrorist organizations. In a lengthy letter, the State Department’s Legal Adviser explained to the District Court how “adjudication of this lawsuit at this time would in fact risk a potentially serious adverse impact on significant interests of the United States, including interests related directly to the on-going struggle against international terrorism.” Under the precedents of the Supreme Court— including Sosa v. Alvarez-Machain, 542 U.S. 692, 733 n. 21, 124 S.Ct. 2739, 159 L.Ed.2d 718 (2004) — and decisions of this Court, the federal courts give deference to reasonable explanations by the Executive Branch that a civil lawsuit would adversely affect the foreign relations of the United States, and the courts dismiss such cases as non-justiciable political questions. Given those precedents and the State Department’s reasonable explanation of how this litigation would harm U.S. interests, we should grant the petition for a writ of mandamus and order dismissal of plaintiffs’ complaint.
I
Exxon Mobil Corporation’s Indonesian subsidiary maintains a large natural gas *358 facility in the Aceh Province of Indonesia. The Province has endured violence as a result of internal tensions between separatists in that region and the Government of Indonesia. To protect its Indonesian natural gas operations, Exxon entered into a contract with Indonesia’s state-owned oil and gas company in which members of the Indonesian military would work as security personnel at Exxon’s facility.
Plaintiffs in this case are Indonesian citizens who reside in the Aceh Province. They allege they were injured by Indonesian military personnel who worked for Exxon. In 2001, plaintiffs sued Exxon in the U.S. District Court for the District of Columbia to recover for those injuries. Plaintiffs brought claims against Exxon under the Alien Tort Statute and international law, the Torture Victim Protection Act, and state tort law. Plaintiffs asserted the same claims against PT Aran LNG Company, a natural gas entity that Exxon and the Indonesian government jointly own.
The fourth largest nation in the world (and the largest Muslim nation), Indonesia has been a key partner of the United States since September 11, 2001, in the ongoing war against al Qaeda and related radical Islamic terrorist organizations. This case — which alleges that Indonesian military personnel injured Indonesian citizens in Indonesia — has triggered serious objections from the Government of Indonesia about intrusion on its sovereignty. The State Department has carefully considered Indonesia’s concerns and how the lawsuit might adversely affect U.S. interests. In 2002, the Legal Adviser for the State Department informed the District Court that “adjudication of this lawsuit at this time would in fact risk a potentially serious adverse impact on significant interests of the United States, including interests related directly to the on-going struggle against international terrorism.” Deferred Appendix (D.A.) at 182. The State Department “anticipate[d] that adjudication of this case will be perceived in Indonesia as a U.S. court trying the GOI for its conduct of a civil war in Aceh.” D.A. 183. In the Department’s view, “[t]he Indonesian response to such perceived U.S. ‘interference’ in its internal affairs could impair cooperation with the U.S. across the full spectrum of diplomatic initiatives, including counterterrorism, military and police reform, and economic and judicial reform.” D.A. 183-84. The State Department explained:
This lawsuit could potentially disrupt the on-going and extensive United States efforts to secure Indonesia’s cooperation in the fight against international terrorist activity. Indonesia is the fourth largest state in the world, with a population of some 210 million. It is also the largest Muslim nation, and serves as a focal point for U.S. initiatives in the ongoing war against Al Qaida and other dangerous terrorist organizations. U.S. counter-terrorism initiatives could be imperiled in numerous ways if Indonesia and its officials curtailed cooperation in response to perceived disrespect for its sovereign interests.
D.A. 184. The State Department further stated that the litigation “may also diminish our ability to work with the Government of Indonesia (‘GOI’) on a variety of important programs, including efforts to promote human rights in Indonesia.” D.A. 182. The Department also noted that “[tjhis litigation appears likely to further discourage foreign investment” in Indonesia, which “in turn, could have decidedly negative consequences for the Indonesian economy”; if a downturn in Indonesia’s economy were to “breed instability it would adversely affect U.S. interests.” D.A. 185. In addition, the Department stated that the suit could have a negative *359 impact on U.S. diplomatic objectives throughout the region, on U.S. businesses, and on the international economy.
The State Department supported its statement with a letter sent by the Indonesian Ambassador to the Deputy Secretary of State: “As a matter of principle, we cannot accept the extra territorial jurisdiction of a United States Court over an allegation against an Indonesian government institution, ... the Indonesian military, for operations taking place in Indonesia.” D.A. 188.
In July 2005, the State Department’s Legal Adviser reiterated the concerns first expressed in 2002, informing the District Court that “the concerns set forth in the State Department letter of July 2002 ... remain valid today.” D.A. 244. Along with the State Department’s 2005 letter, the State Department also submitted a letter from the Indonesian Embassy reiterating the concerns the Government of Indonesia first expressed in 2002.
In October 2005, largely in response to the State Department’s submissions, the District Court dismissed plaintiffs’ federal-law claims against Exxon and dismissed all claims against PT Arun LNG Company. In dismissing the federal-law claims against Exxon, the District Court relied on the State Department’s statement that “ ‘adjudication of this lawsuit at this time would in fact risk a potentially serious adverse impact on significant interests of the United States, including interests related directly to the on-going struggle against international terrorism.’ ” Doe v. Exxon Mobil Corp., 393 F.Supp.2d 20, 22 (D.D.C.2005) (quoting State Department’s 2002 Statement of Interest). The District Court reasoned that “determining whether defendants engaged in joint action with the Indonesian military necessarily would require judicial inquiry into precisely what the two parties agreed to do” and “such an inquiry cuts too close to adjudicating the actions of the Indonesian government.” Id. at 27.
Although it dismissed the federal-law claims, the District Court did not dismiss plaintiffs’ state-law tort claims against Exxon. The District Court stated that litigation and discovery on the state-law claims, “if conducted with care, should alleviate the State Department’s concerns about interfering with Indonesia’s sovereign prerogatives while providing a means for plaintiffs to obtain relief through their garden-variety tort claims.” Id. at 30.
Exxon has filed an interlocutory appeal of the District Court’s denial of Exxon’s motion to dismiss the state-law tort claims. Exxon requests that we entertain its interlocutory appeal under the collateral order doctrine or, in the alternative, that we issue a writ of mandamus requiring dismissal of the state-law tort claims.
II
1. A civil lawsuit in a U.S. court involving a foreign government, foreign officials, or foreign interests may adversely affect relations between the United States and the foreign nation. Such cases therefore pose sensitive separation of powers issues for the Judiciary because the Constitution assigns the Executive and Legislative Branches primary authority over the foreign policy and foreign relations of the United States. See, e.g., Regan v. Wald, 468 U.S. 222, 242, 104 S.Ct. 3026, 82 L.Ed.2d 171 (1984) (“Matters relating to the conduct of foreign relations ... are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference.”) (internal quotation omitted); Haig v. Agee, 453 U.S. 280, 292, 101 S.Ct. 2766, 69 L.Ed.2d 640 (1981) (“Matters intimately related to foreign policy and national security are rarely proper subjects for judicial *360 intervention.”); Chicago & S. Air Lines v. Waterman S.S. Corp., 333 U.S. 103, 111, 68 S.Ct. 431, 92 L.Ed. 568 (1948) (“[T]he very nature of executive decisions as to foreign policy is political, not judicial. Such decisions are wholly confided by our Constitution to the political departments of the government, Executive and Legislative .... They are decisions of a kind for which the Judiciary has neither aptitude, facilities nor responsibility and have long been held to belong in the domain of political power not subject to judicial intrusion or inquiry.”); Oetjen v. Cent. Leather Co., 246 U.S. 297, 302, 38 S.Ct. 309, 62 L.Ed. 726 (1918) (“The conduct of the foreign relations of our Government is committed by the Constitution to the Executive and Legislative — ‘the political’ — Departments of the Government, and the propriety of what may be done in the exercise of this political power is not subject to judicial inquiry or decision.”); see also Dep’t of Navy v. Egan, 484 U.S. 518, 529-30, 108 S.Ct. 818, 98 L.Ed.2d 918 (1988) (“As to these areas of Art. II duties the courts have traditionally shown the utmost deference to Presidential responsibilities.”) (internal quotation omitted); United States v. Curtiss-Wright Exp. Corp., 299 U.S. 304, 319, 57 S.Ct. 216, 81 L.Ed. 255 (1936) (“The President is the sole organ of the nation in its external relations, and its sole representative with foreign nations.”) (internal quotation omitted).
As the courts therefore have recognized, lawsuits that would adversely affect the foreign policy of the United States can pose non-justiciable political questions. See Baker v. Carr, 369 U.S. 186, 211, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962) (Regarding foreign policy issues: “Not only does resolution of such issues frequently turn on standards that defy judicial application, or involve the exercise of a discretion demonstrably committed to the executive or legislature; but many such questions uniquely demand single-voiced statement of the Government’s views.”); Bancoult v. McNamara, 445 F.3d 427, 435 (D.C.Cir. 2006) (describing “topics that serve as the quintessential sources of political questions: national security and foreign relations”); Hwang Geum Joo v. Japan, 413 F.3d 45, 52 (D.C.Cir.2005) (“The Executive’s judgment that adjudication by a domestic court would be inimical to the foreign policy interests of the United States is compelling and renders this case nonjus-ticiable under the political question doctrine.”); Tek-Oren v. Libyan Arab Republic, 726 F.2d 774, 803 (D.C.Cir.1984) (Bork, J., concurring) (“Questions touching on the foreign relations of the United States make up what is likely the largest class of questions to which the political question doctrine has been applied.”).
Courts are not well-equipped to determine on their own, however, whether a particular civil case would have a negative impact on U.S. foreign policy and should be dismissed. In part for that reason, as the Supreme Court has instructed, courts give deference to the Executive Branch when the Executive reasonably explains that adjudication of a particular civil lawsuit would adversely affect the foreign policy interests of the United States. See, e.g., Sosa v. Alvarez-Machain, 542 U.S. 692, 733 n. 21, 124 S.Ct. 2739, 159 L.Ed.2d 718 (2004) (regarding suits involving private parties: “[TJhere is a strong argument that federal courts should give serious weight to the Executive Branch’s view of the case’s impact on foreign policy.”); Republic of Austria v. Altmann, 541 U.S. 677, 702, 124 S.Ct. 2240, 159 L.Ed.2d 1 (2004) (“[SJhould the State Department choose to express its opinion on the implications of exercising jurisdiction over particular petitioners in connection with their alleged conduct, that opinion might well be entitled to deference as the considered *361 judgment of the Executive on a particular question of foreign policy.”) (emphasis in original); Crosby v. Nat’l Foreign Trade Council, 530 U.S. 363, 366, 386, 120 S.Ct. 2288, 147 L.Ed.2d 352 (2000) (regarding state legislation regulating foreign commerce with Burma: “[Rjepeated representations by the Executive Branch supported by formal diplomatic protests and concrete disputes are more than sufficient to demonstrate that the state Act stands in the way of Congress’s diplomatic objectives.”); cf. Am. Ins. Ass’n v. Garamendi, 539 U.S. 396, 424, 123 S.Ct. 2374, 156 L.Ed.2d 376 (2003) (citing letters from State Department explaining harm to foreign policy caused by state law); Regan, 468 U.S. at 243,104 S.Ct. 3026 (referring to “the traditional deference to executive judgment” in foreign policy matters); Ex parte Republic of Peru,, 318 U.S. 578, 588, 63 S.Ct. 793, 87 L.Ed. 1014 (1943) (courts should not exercise their jurisdiction “as to embarrass the executive arm of the government in conducting foreign relations”).
Deference to the Executive Branch’s position on the foreign policy implications of a lawsuit traditionally has occurred in cases directly against foreign governments or foreign government officials. See, e.g., Ex parte Peru, 318 U.S. at 588, 63 S.Ct. 793; Hwang Geum Joo, 413 F.3d at 48; Whiteman v. Dorotheum GmbH & Co. KG, 431 F.3d 57, 59-60 (2d Cir.2005) (citing Altmann, 541 U.S. at 702, 124 S.Ct. 2240, and Sosa footnote 21 and deferring to State Department Statement of Interest in ordering dismissal of suit against Republic of Austria). Beginning in 1980, the category of cases potentially raising foreign policy concerns expanded as a result of the Second Circuit’s decision in Filartiga v. Pena-Irala, 630 F.2d 876 (2d Cir.1980). That case held that, under the Alien Tort Statute, foreign citizens can sue foreign government officials for international law violations committed in foreign countries. See id. at 878, 887; cf. TeL-Oren, 726 F.2d at 775, 792 (Edwards, J., concurring); id. at 799, 812-16 (Bork, J., concurring); id. at 823 (Robb, J., concurring).
In recent years, foreign citizens have taken Filartiga a step further (and in some cases also cited the 1991 Torture Victim Protection Act) and begun to sue multinational corporations in U.S. courts— often alleging corporate complicity in human rights violations committed by foreign government officials against foreign citizens in foreign countries. See generally Beth Stephens, Sosa v. Alvarez-Machain: “The Door Is Still Ajar” for Human Rights Litigation in U.S. Courts, 70 Brook. L. Rev. 533, 537-38 (2005). Although those cases nominally target corporations and not foreign government officials, federal courts have recognized that the suits still can adversely affect U.S. foreign policy interests. Several federal district courts therefore have applied traditional justiciability principles to this new category of cases against corporations, including deference to the Executive Branch as appropriate. See, e.g., Corrie v. Caterpillar, Inc., 403 F.Supp.2d 1019, 1032 (W.D.Wash.2005) (“This case must also be dismissed because it interferes with the foreign policy of the United States of America.... For this court to preclude sales of Caterpillar products to Israel would be to make a foreign policy decision and to impinge directly upon the prerogatives of the executive branch of government.”); Mujica v. Occidental Petroleum Corp., 381 F.Supp.2d 1164, 1194 (C.D.Cal. 2005) (“[T]he State Department has filed a Statement of Interest outlining several areas of foreign policy that would be negatively impacted by proceeding with the instant case.... [Proceeding with the litigation would indicate a ‘lack of respect’ for the Executive’s preferred approach of handling the Santo Domingo bombing and re *362 lations with Colombia in general.”); In re Nazi Era Cases Against German Defendants Litig., 334 F.Supp.2d 690, 695-96 (D.N.J.2004) (“[T]he political question doctrine counsels the Court to dismiss this action.... If this Court adjudicated the Complaint, it would do so against the recommendation of the Executive Branch.”); id. at 695 (“[Allowing private litigation of war-related claims would express a lack of respect for the executive branch.”) (quoting Iwanowa v. Ford Motor Co., 67 F.Supp.2d 424, 486 (D.N.J.1999)); Iwa-nowa, 67 F.Supp.2d at 486 (“The executive branch has always taken the position that claims arising out of World War II must be resolved through government-to-government negotiations. Thus, allowing private litigation of war-related claims would express a lack of respect for the executive branch.”).
In its 2004 decision in Sosa, the Supreme Court confirmed that traditional justiciability principles apply to the new category of cases brought by foreign citizens against multinational corporations. The Court took note of the growing litigation against multinational corporations (and recognized the concerns about such litigation). Although the defendant in Sosa was a foreign official and not a corporation, the Supreme Court pro-actively suggested that, for purposes of applying standard justiciability principles, there is no distinction between (i) suits directly against foreign governments or officials and (ii) suits against non-governmental entities that nonetheless may affect U.S. relations with foreign governments. The Court outlined a “policy of case-specific deference to the political branches” to “several class actions seeking damages from various corporations.” Sosa, 542 U.S. at 733 n. 21, 124 S.Ct. 2739. The Court stated: “[Tjhere is a strong argument that federal courts should give serious weight to the Executive Branch’s view of the case’s impact on foreign policy.” Id. (citing Altmann, 541 U.S. at 701-02, 124 S.Ct. 2240); cf. Garamendi, 539 U.S. at 415-16, 123 S.Ct. 2374 (“The executive agreements ■ at issue here do differ in one respect from those just mentioned insofar as they address claims associated with formerly belligerent states, but against corporations, not the foreign governments. But the distinction does not matter. Historically, wartime claims against even nominally private entities have become issues in international diplomacy .... ”); Crosby, 530 U.S. at 386, 120 S.Ct. 2288 (Court “acknowledged that the nuances of the foreign policy of the United States ... are much more the province of the Executive Branch and Congress than of this Court” in litigation challenging state legislation regulating private corporations engaged in foreign commerce) (internal quotation omitted).
In the wake of Sosa, the lower federal courts properly give “serious weight” to Executive Branch statements of interest in human rights cases brought against multinational corporations. See Sosa, 542 U.S. at 733 n. 21, 124 S.Ct. 2739. Of course, serious weight does not mean conclusive weight. Judicial deference to the Executive Branch regarding the foreign policy implications of a civil lawsuit does not mean judicial abdication. It is not enough, therefore, for the Executive Branch merely to assert harm; rather, the harm must be explained — and explained reasonably. In other words, as in other eases involving Executive Branch statements about the adverse impact on U.S. foreign policy interests, the fundamental question for the Judiciary is whether the Executive Branch has reasonably explained that the litigation would adversely affect the foreign policy interests of the United States. Cf. Hwang Geum Joo, 413 F.3d at 48, 52.
This Court’s decision in Hwang Geum Joo exemplifies proper application of those traditional justiciability principles. In that *363 case, 15 women from China, Taiwan, South Korea, and the Philippines sued Japan under the Alien Tort Statute for international law violations. Id. at 46. The plaintiffs alleged that Japanese soldiers had subjected them to torture before and during World War II. Id. The plaintiffs and the Japanese government disagreed about whether peace treaties between Japan and plaintiffs’ countries of origin extinguished war claims made against Japan by citizens of the plaintiffs’ countries. Id. at 48. The State Department submitted a Statement of Interest stating “that judicial intrusion into the relations between Japan and other foreign governments would impinge upon the ability of the President to conduct the foreign relations of the United States.” Id. In deciding the case, this Court “defer[red] to the judgment of the Executive Branch” as set forth in the Department’s “thorough and persuasive Statement of Interest” and concluded that “our Constitution does not vest the authority to resolve that dispute in the courts.” Id.
In another case involving the foreign policy interests of the United States, this Court also explained that “we grant substantial weight” to State Department statements regarding factual questions that are “at the heart of the Department’s expertise.” In re Papandreou, 139 F.3d 247, 252 & n. 2 (D.C.Cir.1998). Such questions, we said, include State Department determinations about the extent to which U.S. interests are affected by “the sensitive diplomatic considerations involved” in certain legal claims. Id. at 252 (internal quotation omitted). In addressing the related “act of state” doctrine, this Court similarly has recognized “the value of obtaining views of the Executive Branch in matters relating to the application of the act of state doctrine and giving appropriate weight to those views.” Millen Indus., Inc. v. Coordination Council, 855 F.2d 879, 881 (D.C.Cir.1988).
All of the above precedents have established the following principle of law: When presented with a suit alleging wrongdoing committed in a foreign country, and particularly a suit implicating the actions of foreign government officials, federal courts should dismiss the complaint on justiciability grounds if the Executive Branch has reasonably explained that the suit would harm U.S. foreign policy interests.
2. Given those precedents and principles, the question in this case is whether the Executive Branch reasonably explained that this case would harm U.S. interests. I believe it clearly has done so.
In 2002 and then again in 2005, the State Department unambiguously stated to the District Court that, for multiple reasons, “adjudication of this lawsuit at this time would in fact risk a potentially serious adverse impact on significant interests of the United States, including interests related directly to the on-going struggle against international terrorism.” D.A. 182. The State Department emphasized that Indonesia is “a focal point for U.S. initiatives in the ongoing war against A1 Qaida and other dangerous terrorist organizations. U.S. counter-terrorism initiatives could be imperiled in numerous ways if Indonesia and its officials curtailed cooperation in response to perceived disrespect for its sovereign interests.” D.A. 184. The Department explained that Indonesia would view this lawsuit as an intrusion on its sovereignty. The Department stated that “[tjhis lawsuit could potentially disrupt the on-going and extensive United States efforts to secure Indonesia’s cooperation in the fight against international terrorist activity.” D.A. 184. The Department identified and explained multiple other effects on foreign relations, including, for example: an adverse impact on human rights objec *364 tives; negative effects on foreign investment, which would have negative impacts on stability and economic conditions; and decreased opportunities for U.S. business abroad. Along with its 2002 statement, the State Department submitted to the District Court a letter from the Indonesian Ambassador that stated, “As a matter of principle, we cannot accept the extra territorial jurisdiction of a United States Court over an allegation against an Indonesian government institution, ... the Indonesian military, for operations taking place in Indonesia.” D.A. 188. Then in July 2005, the State Department provided a new letter stating that the concerns set forth in its initial letter “remain valid today.” D.A. 244. Enclosed with that letter was another letter from the Indonesian government, reiterating the concerns Indonesia first expressed in 2002. Nothing in the record since 2005 purports to withdraw the concerns raised by either the State Department or the Government of Indonesia.
In light of the decisions of the Supreme Court (Sosa in particular), this Court’s decisions (Hwang Geum Joo in particular), and the State Department's reasonable explanation of how this litigation would harm U.S. foreign policy interests, this case should be dismissed as a non-justiciable political question. (In reaching this conclusion, my point is that the State Department’s explanation of harms in this case is clearly sufficient to require dismissal of this suit. I do not mean to imply, however, that all of the harms cited by the State Department in this case are necessary in order for courts to give deference to the Executive Branch. In other words, courts defer to the Executive Branch’s reasonable explanation that a case would harm U.S. interests even if the harm is something less than, for example, a negative impact on the war against al Qaeda.)
3. The District Court agreed with the above principles in dismissing the majority of plaintiffs’ claims. In particular, the District Court relied on the State Department’s statement that “ ‘adjudication of this lawsuit at this time would in fact risk a potentially serious adverse impact on significant interests of the United States, including interests related directly to the on-going struggle against international terrorism.’ ” Exxon Mobil Corp., 393 F.Supp.2d at 22 (quoting State Department’s 2002 Statement of Interest). The District Court also highlighted the Supreme Court’s warning in Sosa that courts should be “ ‘particularly wary of impinging on the discretion of the Legislative and Executive branches in managing foreign affairs,’ particularly when the Executive has expressed its views about the litigation.” Id. at 23 (quoting 542 U.S. at 727, 124 S.Ct. 2739) (internal citation omitted). And the District Court proceeded to dismiss plaintiffs’ federal-law claims in part because “determining whether defendants engaged in joint action with the Indonesian military necessarily would require judicial inquiry into precisely what the two parties agreed to do” and “such an inquiry cuts too close to adjudicating the actions of the Indonesian government.” Id. at 27.
Having gone that far, however, the District Court allowed plaintiffs’ state-law claims to move forward. I believe the same justiciability concerns that the District Court identified with respect to the federal-law claims also apply to the state-law claims. Regardless whether plaintiffs are attempting to establish Exxon’s liability for state-law claims or federal-law claims, plaintiffs must prove that members of the Indonesian military engaged in acts of violence in Indonesia against Indonesian citizens. As a result, the District Court necessarily would be “adjudicating the actions of the Indonesian government” when it continues adjudication of plaintiffs’ state- *365 law claims, just as the District Court would have done had it entertained plaintiffs’ federal-law claims. Moreover, nothing in the State Department letter distinguished federal and state law claims in assessing the harm to U.S. foreign policy interests — indicating that the state-law claims pose just as much a threat to U.S. foreign policy interests as the federal-law claims. In sum, I respectfully submit that the District Court should have dismissed the state-law claims based on the same State Department concerns that supported the District Court’s dismissal of the federal-law claims.
Because only state-law claims remain, plaintiffs’ case also has a separate doctrinal problem — preemption. As the Supreme Court has stated, the possibility that state law (in this case, D.C. tort law) “will produce something more than incidental effect in conflict with express foreign policy of the National Government ... require[s] preemption of the state law.” Garamendi, 539 U.S. at 420, 123 S.Ct. 2374. Although we need not resolve the issue here, the state-law tort claims are likely preempted as a result of the State Department’s specific statement of harm to foreign policy. See, e.g., id. at 413, 424, 123 S.Ct. 2374 (referencing Executive Branch statements regarding conflict caused by state law and stating: “There is, of course, no question that at some point an exercise of state power that touches on foreign relations must yield to the National Government’s policy, given the concern for uniformity in this country’s dealings with foreign nations that animated the Constitution’s allocation of the foreign relations power to the National Government in the first place.”) (internal quotation omitted); cf. Geier v. Am. Honda Motor Co., Inc., 529 U.S. 861, 886, 120 S.Ct. 1913, 146 L.Ed.2d 914 (2000) (holding that federal statute preempted state-law tort action); see generally Jack Goldsmith, Statutory Foreign Affairs Preemption, 2000 Sup. Ct. Rev. 175, 203-05, 213 (2000) (“[Cjourts should preempt state law only when the justification for preemption is fairly traceable to the foreign policy choices not of the federal courts, but rather of the federal political branches.”).
4. For its part, the majority opinion says that the State Department has not “unambiguously ” set forth its position on this lawsuit. The majority opinion seizes on footnote 1 of the State Department’s 2002 Statement of Interest * and concludes that this footnote undermines the Department’s statement that “adjudication of this lawsuit at this time would in fact risk a potentially serious adverse impact on significant interests of the United States, including interests related directly to the ongoing struggle against international terrorism.” See Maj. Op.- at 358; D.A. 182. I respectfully think the majority opinion misreads the State Department footnote— and as a result gives unduly short shrift to the State Department’s Statement of Interest.
In the same way that Executive agencies often do when justifying decisions nec *366 essarily based on predictive judgments, footnote 1 simply sets forth the factors on which the State Department based its judgment that the litigation itself would harm U.S. foreign policy interests. Footnote 1 does not purport to lay out a road-map for the District Court to alleviate the State Department’s concerns as the litigation unfolds — for example, by fashioning the scope of the litigation in a certain way. To be sure, the Department said its ultimate judgment regarding the effect of this suit was “predictive” and “contingent” on several factors. But that truism is not a hook for the majority opinion to override the Department’s bottom-line conclusion. After all, judgments of this kind are always predictive in the sense that the State Department can never know in advance precisely how future events will unfold and affect U.S. foreign policy.
The majority opinion does not grapple, moreover, with the illogic of this reading: Why would the State Department definitively say that “adjudication of this lawsuit at this time would in fact risk a potentially serious adverse impact on significant interests of the United States” if the Department intended only to say that the District Court should make certain changes to the scope of the lawsuit to alleviate possible foreign policy concerns? The majority opinion interprets the footnote to contradict the remainder of the Department’s letter — which shows, I believe, that the majority opinion’s interpretation of the footnote cannot be correct.
The key point here is that the State Department thoroughly explained its reasoning and firmly stated that this suit would harm relations with Indonesia and therefore negatively affect the U.S. war against al Qaeda, among several other adverse effects on significant U.S. interests. As support, the Department attached the Indonesian Ambassador’s letter stating that “we cannot accept the extra territorial jurisdiction of a United States Court over an allegation against an Indonesian government institution.” D.A. 188. In my judgment, under the precedents that guide our analysis in this area, there is no persuasive basis for disregarding the Executive Branch’s statement that “adjudication of this lawsuit at this time would in fact risk a potentially serious adverse impact on significant interests of the United States, including interests related directly to the on-going struggle against international terrorism.” D.A. 182. The majority opinion’s rejection of the definitive and reasoned Executive Branch statement about this lawsuit’s negative impact on America’s prosecution of an ongoing war does not reflect the judicial restraint and deference that the Supreme Court and this Court have required in the sensitive area of foreign policy. See Maj. Op. at 354.
5. In analyzing the justiciability issue, the majority opinion seeks to buttress its conclusion by citing the decisions of “several other circuits” that purportedly “have refused to invoke the political question doctrine to dismiss claims that were very similar to those in the instant case.” Maj. Op. at 354-55. Only one post-Sosa case cited by the majority opinion has addressed the political question doctrine in the context of a State Department Statement of Interest — the Ninth Circuit’s divided decision in Sarei v. Rio Tinto, PLC, 456 F.3d 1069 (9th Cir.2006). (In Sarei, residents of Papua New Guinea alleged corporate complicity in human rights violations committed by the Government of Pa-pua New Guinea. Id. at 1073-75.)
The court in Sarei accepted the premise of the Supreme Court’s statement in Sosa footnote 21 — namely, that courts should defer to the Executive Branch’s reasonable explanations of harm in cases against pri *367 vate entities. See id. at 1081. But the Ninth Circuit refused to defer to the particular State Department statement in that case. Id. at 1082-83. For purposes of our analysis, two points are important about Sarei: First, the State Department’s Statement of Interest in Sarei was “guarded,” so the Ninth Circuit’s opinion is not particularly instructive to our decision here, in which the State Department’s statement is strongly worded and clearly identifies a negative effect on, among other things, U.S. prosecution of an ongoing war. Id. at 1082. Second, in any event, I would not follow the Ninth Circuit’s opinion in Sarei because I respectfully believe the decision is incorrect for reasons well stated by Judge Morrow in her thorough and persuasive District Court analysis in that case:
Ruling on the merits of these allegations will inevitably require passing judgment on the pre-war and war-time conduct of the PNG government. It is this type of judgment that the Statement of Interest indicates may have serious implications for the future of the peace agreement that has been reached, and thus for the foreign policy objectives the executive branch has set. It is also the type of judgment that risks placing the court in the position of announcing a view that is contrary to that of a coordinate branch of government, with all the attendant embarrassment that would ensue. The situation is thus quintessentially one that calls for invocation of the political question doctrine as to each of plaintiffs’ causes of action.
Sarei v. Rio Tinto, PLC, 221 F.Supp.2d 1116,1198-99 (C.D.Cal.2002).
Ill
The final question here is whether this Court possesses the authority to entertain this interlocutory appeal. In my judgment, the standard for this Court to issue a writ of mandamus is plainly satisfied. To be sure, “[t]he remedy of mandamus is a drastic one, to be invoked only in extraordinary situations.” Kerr v. U.S. Dist. Court for N. Dist. of Cal., 426 U.S. 394, 402, 96 S.Ct. 2119, 48 L.Ed.2d 725 (1976) (internal quotation omitted). A court will issue the writ “only upon a showing that the petitioner’s right is ‘clear and indisputable,’ and that ‘no other adequate means to attain the relief exist.” In re Sealed Case, 141 F.3d 337, 339 (D.C.Cir.1998) (quoting Gulfstream Aerospace Corp. v. Mayaca-mas Corp., 485 U.S. 271, 289, 108 S.Ct. 1133, 99 L.Ed.2d 296 (1988) and Allied Chem. Coyp. v. Daiflon, Inc., 449 U.S. 33, 35, 101 S.Ct. 188, 66 L.Ed.2d 193 (1980)) (internal citation omitted).
The Supreme Court has made clear that mandamus is appropriate to prevent interference with foreign policy responsibilities that the Constitution has allocated to the Executive and Legislative Branches. In granting a writ of mandamus in Ex parte Republic of Peru, for example, the Supreme Court stated that cases intruding on the foreign policy responsibilities of the Executive Branch can be “of such public importance and exceptional character as to call for the exercise of our discretion to issue the writ.” 318 U.S. 578, 586, 63 S.Ct. 793, 87 L.Ed. 1014 (1943). In lawsuits involving the “dignity and rights of a friendly sovereign state,” the Court noted, “it is of public importance that the action of the political arm of the Government taken within its appropriate sphere be promptly recognized, and that the delay and inconvenience of a prolonged litigation be avoided by prompt termination of the proceedings in the district court.” Id. at 587, 63 S.Ct. 793.
The Supreme Court recently reiterated the principles of Ex parte Peru, indicating that mandamus is warranted when a law *368 suit “would threaten the separation of powers by ‘embarrass[ing] the executive arm of the Government.’ ” Cheney v. U.S. Dist. Court for the Dist. of Columbia, 542 U.S. 367, 380-81, 124 S.Ct. 2576, 159 L.Ed.2d 459 (2004) (quoting Ex parte Peru, 318 U.S. at 588, 63 S.Ct. 793). The Cheney case re-affirmed that mandamus is proper “to prevent a lower court from interfering with a coequal branch’s ability to discharge its constitutional responsibilities.” Id. at 382, 124 S.Ct. 2576; see also In re Austrian & German Holocaust Li-tig., 250 F.3d 156, 163-65 (2d Cir.2001) (in issuing writ of mandamus, court relies on political question doctrine and states that courts should not intrude on foreign policy prerogatives of political branches).
The majority opinion suggests that the mandamus principles articulated in Ex parte Peru and reiterated in Cheney are properly applied only in cases in which the property of a foreign government is at stake or a governmental entity is a party to a suit. See Maj. Op. at 355-56. I believe the majority opinion’s attempt to distinguish Ex paHe Peru is misplaced for two reasons — one factual and one legal.
First, as a factual matter, the foreign policy effect of plaintiffs’ claims is not distinct from the effect of claims challenging the property or actions of a foreign government. Establishing liability against Exxon necessarily requires proving that members of the Indonesian military — acting pursuant to a contract entered into by the Indonesian Government — committed acts of violence against Indonesian citizens in Indonesia. Such proof is a necessary component of establishing either Exxon’s vicarious liability for the alleged violent acts or Exxon’s direct liability for negligently hiring the alleged bad actors. And the governmental nature of the allegations is why the Government of Indonesia has objected to this case (and why the Executive Branch is therefore concerned about it). See D.A. 183 (State Department’s 2002 Statement of Interest: “All of the human rights abuses and injuries alleged in the complaint refer to conduct claimed to have been committed by the military and police forces of the GOL”). Therefore, I believe the majority opinion is incorrect to imply that this is somehow just a routine lawsuit involving allegations against a private corporation. Cf. Sosa v. Alvarez-Machain, 542 U.S. 692, 733 n. 21, 124 S.Ct. 2739, 159 L.Ed.2d 718 (2004); Am. Ins. Ass’n v. Garamendi, 539 U.S. 396, 424, 123 S.Ct. 2374, 156 L.Ed.2d 376 (2003). Rather, this suit alleges wrongdoing by members of a foreign military who were supplied by a foreign state-owned entity to provide security at a facility offering vital infrastructural services for a foreign nation.
Second, apart from that factual hole in the majority opinion’s distinction of Ex parte Peru, the key question for purposes of mandamus (as it is for assessing justici-ability) is whether the Executive Branch has reasonably explained that the foreign policy interests of the United States would be adversely affected — not the identity of the named parties in the lawsuit. In Ex parte Peru, for example, the Supreme Court instructed that a district court should terminate litigation when that litigation adversely affects the foreign policy interests of the United States. See 318 U.S. at 586-87, 63 S.Ct. 793 (“The case involves the dignity and rights of a friendly sovereign state, claims against which are normally presented and settled in the course of the conduct of foreign affairs by the President and by the Department of State.”). There is no logical or principled basis for granting mandamus in some cases that severely affect the foreign policy interests of the United States, but not in other cases, just because of the named defendants. Cf. Sosa, 542 U.S. at 733 n. *369 21, 124 S.Ct. 2739. The rale of Ex parte Peru, is straightforward: If the District Court incorrectly green-lights a lawsuit that would adversely affect the foreign policy interests of the United States, mandamus is warranted.
Finally, the majority opinion also suggests that mandamus is not warranted because the District Court narrowed the litigation to protect U.S. interests. Maj. Op. at 353-54. But the U.S. foreign policy interest here is not simply in avoiding the effects of a final judgment, but is in avoiding the repercussions of the litigation itself. In cases (analogous for these purposes) involving foreign sovereign immunity, courts therefore have recognized that mandamus is an appropriate remedy when the litigation itself could harm the interests underlying sovereign immunity. See, e.g., Ex parte Peru, 318 U.S. at 587, 63 S.Ct. 793 (“[I]t is of public importance that the action of the political arm of the Government taken within its appropriate sphere be promptly recognized, and that the delay and inconvenience of a prolonged litigation be avoided by prompt termination of the proceedings in the district court.”); In re Papandreou, 139 F.3d 247, 251 (D.C.Cir.1998) (granting mandamus in case involving foreign sovereign immunity: “[Sjovereign immunity is an immunity from trial and the attendant burdens of litigation, and not just a defense to liability on the merits.”) (internal quotation omitted). The same rationale applies here.
IV
Although I disagree with the majority opinion’s resolution of this case, there appears to be common ground about how litigation of the remaining state-law claims should proceed in the District Court. The State Department again will have an opportunity to express its views (previously expressed in 2002 and 2005) regarding this suit. If the State Department were to withdraw its previously stated opposition to the state-law claims, then I would agree that the state-law claims would not be barred by the political question doctrine. See First Nat’l City Bank v. Banco Na-cional de Cuba, 406 U.S. 759, 768, 92 S.Ct. 1808, 32 L.Ed.2d 466 (1972) (plurality opinion of Rehnquist, J.) (suit against foreign government corporation may proceed because Executive Branch “has advised us” that suit would not “frustrate the conduct of this country’s foreign relations”). On the other hand, I assume the majority would agree that the District Court should dismiss the case if the State Department reasonably and unambiguously states that litigation of the state-law claims would affect U.S. foreign policy interests. See Maj. Op. at 354. Indeed, even plaintiffs’ counsel appeared to agree at oral argument that dismissal by the District Court (and, if not, then mandamus by this Court) would be warranted if the State Department reasonably explained to the District Court that the remainder of this case would negatively affect U.S. efforts in the war against al Qaeda. See Tr. of Oral Arg. at 23-24. Therefore, I expect that the District Court will obtain the State Department’s specific views on the remaining state-law claims in the litigation and proceed accordingly.
* * *
In light of the precedents of the Supreme Court and this Court, and the State Department’s reasonable explanation of how this lawsuit would harm U.S. interests, I would grant the petition for a writ of mandamus and order dismissal of the complaint as a non-justiciable political question. I respectfully dissent.

 The State Department’s footnote 1 states: "Much of this assessment is necessarily predictive and contingent on how the case might unfold in the course of litigation. E.g., the nature, extent, and intrusiveness of discovery; the degree to which the case might directly implicate matters of great sensitivity to the Government of Indonesia and call for judicial pronouncements on the official actions of the GOI with respect to the conduct of its military activities in Aceh; the effect that a decision in favor of plaintiffs might encourage secessionist activities in Aceh and elsewhere in Indonesia; whether the case were to go to a jury and, if so, whether a substantial monetary award were to be imposed on Exxon Mobil; how other large commercial interests might interpret such a judgment when making investment decisions in Indonesia.” D.A. 183 n. 1.